No. 24-1147

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

APRIL MALICK, ROB MALICK, and C.M., a minor child,

Plaintiffs-Appellants,

v.

CROSWELL-LEXINGTON DISTRICT SCHOOLS,
CROSWELL-LEXINGTON BOARD OF EDUCATION,
DAN GILBERTSON, and KYLE WOOD,

Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of Michigan
Docket No. 22-cv-11126

**AMICUS CURIAE BRIEF OF THE AMERICAN CIVIL LIBERTIES
UNION OF MICHIGAN IN SUPPORT OF PLAINTIFFS-APPELLANTS
AND REVERSAL**

Bonsitu Kitaba-Gaviglio
Daniel S. Korobkin
American Civil Liberties
  Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI  48201
(313) 578-6800
bkitaba@aclumich.org

August 15, 2024                    Counsel for Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae American Civil Liberties Union of Michigan is not a subsidiary or affiliate of a publicly owned corporation and knows of no publicly owned corporation, not a party to this appeal, that has a financial interest in the outcome.

/s/ *Bonsitu Kitaba-Gaviglio*
Bonsitu Kitaba-Gaviglio

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF INTEREST ................................................................1

INTRODUCTION ...........................................................................2

ARGUMENT .................................................................................3

   I.   SCHOOLS HAVE A LEGAL OBLIGATION TO ADDRESS RACE-BASED HARASSMENT OF STUDENTS ...................................................3

   II.  SCHOOLS HAVE MANY TOOLS AT THEIR DISPOSAL TO ADDRESS RACE-BASED HARASSMENT AND OTHER DISCRIMINATION .........................................................................7

       A.  Schools can provide meaningful training to address the harassment or other discrimination at issue ...........................................................8

       B.  Restorative practices, including conferencing with students, families, offenders, and other stakeholders can be effective at recognizing and repairing the harm caused by harassment or other discrimination........10

       C.  Educational remedies, mental health support, and safety plans are ways to help victims preserve educational opportunities despite the harassment ............................................................................13

       D.  A historically accurate curriculum that teaches and affirms the diversity of students and the world can be effective at addressing a hostile educational environment...........................................................15

       E.  Monitoring and assessing the effectiveness of remedial actions and anti-harassment/discrimination efforts can ensure that a school district is responsive to circumstances as they evolve .........................17

   III. A JURY COULD FIND THE DISTRICT VIOLATED FEDERAL LAW BECAUSE IT FAILED TO TRY SOMETHING NEW WHEN ITS RESPONSE PROVED INEFFECTIVE.....................................................18

CONCLUSION................................................................................22

CERTIFICATE OF COMPLIANCE....................................................23

CERTIFICATE OF SERVICE ..............................................................24

# TABLE OF AUTHORITIES

## Cases

*Bryant v. Indep. Sch. Dist. No. I–38,* 334 F.3d 928 (10th Cir. 2003)........................3

*Canty v. Old Rochester Reg'l Sch. Dist.*, 66 F. Supp. 2d 114 (D. Mass. 1999) ........5

*Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629 (1999) .....................................3, 4

*Doe ex rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459 (6th Cir. 2022) ..........................................................................................20

*Doe v. Alpena Pub. Sch. Dist.*, 3 N.W.3d 838 (Mich. Ct. App. 2022), *rev'd,* __ N.W.3d __, 2024 WL 3573522 (Mich. 2024) ..........................................12

*Doe v. District of Columbia*, 694 F. Supp. 3d 20 (D.D.C. 2023) ............................14

*Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257 (4th Cir. 2021) .....................................4

*Doe v. Ohio Univ.*, No. 2:21-cv-858, 2022 WL 899687 (S.D. Ohio Mar. 28, 2022) ................................................................................................................14

*Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248 (11th Cir. 2010)..........................4

*Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788 (M.D. Tenn. 2016).......................7

*Feminist Majority Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018)....... 9, 10, 14, 18

*Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960 (6th Cir. 2020) ....... 13, 14

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ..................................3

*Hall v. Millersville Univ.*, 22 F.4th 397 (3d Cir. 2022) ...........................................4

*Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999)..................................20, 21

*Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613 (6th Cir. 2019) ..................................................................................................................20

*S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69 (4th Cir. 2016) ..................................................................................................................14

*S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707 (6th Cir. 2023) .............................3

*Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577 (5th Cir. 2020) ...............................3

*Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007).................6

*Soper v. Hoben*, 195 F.3d 845 (6th Cir. 1999)................................................ 14, 15

*Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834 (6th Cir. 2016) ..............7

*Strickland v. City of Detroit*, 995 F.3d 495 (6th Cir. 2021)....................................20

*Thompson v. Ohio State Univ.*, 639 F. App'x 333 (6th Cir. 2016)...........................4

*Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000)................4, 5

*Williams ex rel. Hart v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360 (6th Cir. 2005)...........................................................................................................7

*Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655 (2d Cir. 2012)................ passim

## Statutes

20 U.S.C. § 1687.............................................................................................3

42 U.S.C. § 2000d...........................................................................................3

Mich. Comp. Laws § 380.1310c................................................................ 11, 12

## Rules

Fed. R. App. P. 29..........................................................................................1

## Other Authorities

Center for Justice Innovation, *Restorative Justice in Schools: A Whole-School Implementation Process* (April 2021) .................................................13

Christy Byrd, *Does Culturally Relevant Teaching Work? An Examination From Student Perspectives*, Sage Open (July 2016) .............................. 15, 16

Ekene Francis Okagbue, et al., *Does School Bullying Show Lack of Effective Multicultural Education in the School Curriculum?*, Int'l J. Educ. Rsch. Open (June 2022)..................................................................................16

Isabella Lanza, et al., *A Silver Lining: The Role of Ethnic Diversity on Co-occurring Trajectories of Weight Status and Peer Victimization Across Early Adolescence*, J. Adolescent Health, 554-60 (2018)................16

Jefferson County Public School District, *Racial Equity Analysis Protocol*...........17

Luke Roberts, Restorative Justice Council, *Racism in the Playground: A Restorative Justice Response,*............................................................... 11, 12

Minneapolis Public School District, *Equity and Diversity Impact Assessment* (Apr. 2024) ..............................................................................................17

Nicholas Gage, et al., *School Climate and Bullying Victimization: A Latent Class Growth Model Analysis*, Sch. Psych. Q., 256-71 (2014).....................16

Russlynn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter (Oct. 26, 2010). ........... 10, 13, 15, 17

*Settlement Agreement Between the United States of America and the Falcon School District 49* ......................................................................................9, 17

U.S. Dep't of Ed., Office for Civil Rights, *Part II: Step-by-Step Guidance: Creating a Supportive School Climate that Appreciates Racial, Cultural, and Other Forms of Diversity* (Jan. 1999) ...............................8, 17

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union of Michigan ("ACLU") is the Michigan affiliate of a nationwide nonpartisan organization of over a million members dedicated to protecting the civil liberties and civil rights guaranteed by the United States Constitution. The ACLU regularly and frequently participates in litigation in state and federal courts seeking to protect the constitutional rights of people in Michigan. The ACLU advocates on behalf of the rights of students in schools to be free from all forms of harassment and other discrimination, and to ensure students have access to a safe environment that is conductive to learning while respecting their individual rights. The ACLU brought litigation on behalf of all Flint children after the Flint Water Crisis, advocating for systemic change of the special education system to meet the needs of children who were affected by lead in their drinking water, *see D.R. v. Mich. Dep't of Educ.*, E.D. Mich. Case No. 16-cv-13694; has long advocated for the preservation of public school funding, *see CAP v. Michigan*, Mich. Sup. Ct. Case No. 158751; and celebrates public schools for adopting policies that respect students' rights and identities, *see Reynolds v. Talberg*, W.D. Mich. Case No. 1:18-cv-00069.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, amicus curiae states that no counsel for a party authored this brief in whole or in part, nor did anyone, other than amicus or their counsel, make a monetary contribution intended to fund the preparation or submission of the brief.

## INTRODUCTION

The harassment C.M. suffered at Croswell-Lexington District Schools was egregious. It was not, unfortunately, unique. Across Michigan, and across the country, too many students experience racial harassment by their classmates. The good news is that schools have many remedies at their disposal—not just, as the district court assumed below, student discipline. To address a known harassment problem, schools can, among other measures, offer trainings, restorative interventions, or victim-support measures. They can promote student acceptance and tolerance through education about other cultures, and they can track the success—or lack thereof—of their policies and practices, making changes as necessary. Through these tools, schools can combat hostile environments to ensure safe and equitable classrooms where students can learn and grow.

Croswell-Lexington District Schools, however, failed to try these remedies, instead relying on suspensions that it knew were ineffective at stopping the harassment. The District did so despite its knowledge that racial harassment pervaded its schools to such a degree that C.M.'s family pulled her out of school for a year, and despite offers of help from the local NAACP. As a result, a jury could find that the District violated federal law.

Accordingly, the district court's grant of summary judgment should be reversed, and the case remanded for trial.

## ARGUMENT

### I.  SCHOOLS HAVE A LEGAL OBLIGATION TO ADDRESS RACE-BASED HARASSMENT OF STUDENTS.

Michigan schools must remediate race-based harassment that disrupts students' educations. That obligation is not only a pedagogical imperative but a legal requirement under Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the U.S. Constitution.

Title VI prohibits race discrimination by "any program or activity," including any school, that "receiv[es] Federal financial assistance." 42 U.S.C. § 2000d; *see* 20 U.S.C. § 1687 (defining "program or activity" to include schools). The Supreme Court has held that schools may be liable for their response, or lack thereof, to sexual harassment of students by their peers. *Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 653 (1999); *see S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 715-16 (6th Cir. 2023). "Title VI . . . is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). Accordingly, other circuits have held that a school may be liable under Title VI for mishandling peer racial harassment. *See, e.g.*, *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 584 (5th Cir. 2020); *Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655, 665 n.10 (2d Cir. 2012); *Bryant v. Indep. Sch. Dist. No. I–38,* 334 F.3d 928, 934 (10th Cir. 2003). And this Court has assumed as much in an

unpublished opinion. *Thompson v. Ohio State Univ.*, 639 F. App'x 333, 342 (6th Cir. 2016).

   To establish a claim for racial harassment under Title VI, just like a claim for sexual harassment under Title IX, a plaintiff must demonstrate that (1) she suffered harassment so severe and pervasive as to deprive her of educational opportunities or benefits, (2) the defendant school had actual notice of the harassment, and (3) the defendant school was nonetheless deliberately indifferent to it. *Davis*, 526 U.S. at 633; *Zeno*, 703 F.3d 655. At issue in this appeal is the deliberate indifference element. A school is deliberately indifferent "where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Appeals courts, including this one, are in unanimous agreement that a school may not avoid a finding of deliberate indifference simply because "it did not just do 'nothing.'" *Hall v. Millersville Univ.*, 22 F.4th 397, 411 (3d Cir. 2022); *see also, e.g.*, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (explaining a "minimalist response" is not sufficient to avoid liability); *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1259-60 (11th Cir. 2010) (holding a school may be liable even if it "took *some* action in response to [the] sexual harassment allegations"); *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 271 (4th Cir. 2021) (noting a "half-hearted investigation or remedial action will [not] suffice to shield a school from liability").

4

In particular, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances," and so may be liable. *Vance*, 231 F.3d at 261; *see Zeno*, 702 F.3d at 669-70 (same). For example, this Court held that a reasonable jury could find a school district was deliberately indifferent when, in the face of ongoing sexual harassment, it "continued to use the same ineffective methods"—"talking to the offenders"—"to no acknowledged avail." *Vance*, 231 F.3d at 262. In doing so, the Court favorably discussed a similar, out-of-circuit case. *Id.* (citing *Canty v. Old Rochester Reg'l Sch. Dist.*, 66 F. Supp. 2d 114, 116-17 (D. Mass. 1999)). There, a district court held that a school was deliberately indifferent when it repeatedly reprimanded a coach who had harassed a student, and restricted the coach's contact with the victim, because the school failed to "take further steps" once it learned these interventions were "inadequate" to end the harassment. *Id.* (quoting *Canty*, 66 F. Supp. 2d at 117).

By like token, in *Zeno v. Pine Plains Central School District*, the Second Circuit concluded a reasonable jury could find a school district was deliberately indifferent because it failed to pursue new interventions when it realized its initial response to racial harassment—disciplining the harassers—was ineffective. *Zeno*, 702 F.3d at 668-71. That school "argue[d] that its disciplinary response could not constitute deliberate indifference because it immediately suspended nearly every

student who was identified as harassing" the plaintiff. *Id.* at 668. But, the Second Circuit explained, the school knew that discipline "did not deter others from engaging . . . in serious and offensive racial conduct." *Id.* at 669. As the student-victim put it, "if it wasn't the same kid [harassing him], it would always be someone replacing that kid, because they were all connected." *Id*. at 662. And yet the school "dragged its feet before implementing any non-disciplinary remedial action," which were "little more than half-hearted measures," like a poorly planned mediation. *Id.* at 669-70. And it rebuffed an offer from the NAACP and another local organization to provide "racial sensitivity training," instead offering generic, and optional, anti-bullying education. *Id.* at 670.  Because "a jury reasonably could have found that the [school] ignored the many signals that greater, more directed action was needed," a jury could find it was deliberately indifferent. *Id.* at 671.

Other courts, too, have held that a school could be liable where it failed to implement trainings clearly needed to end harassment. For example, the Tenth Circuit held in *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007), that the defendant-school could be found to be deliberately indifferent for having failed to provide sexual harassment training to staff and students in its athletics program once the need for training became obvious from an ongoing pattern of assaults. *Id*. at 1184-85; *see also Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788,

808 (M.D. Tenn. 2016) (holding Title IX liability can arise from lack of harassment/discrimination training, among other failures).

The Equal Protection Clause of the U.S. Constitution—enforced, in suits for money damages, through 42 U.S.C. § 1983—also requires schools to address peer racial harassment. "The deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX [or Title VI] cases." *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 852 (6th Cir. 2016) (quoting *Williams ex rel. Hart v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)). The plaintiff must establish "that he was subjected to discriminatory peer harassment" and "that school officials responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly unreasonable in light of known circumstances." *Id.*

## II.    SCHOOLS HAVE MANY TOOLS AT THEIR DISPOSAL TO ADDRESS RACE-BASED HARASSMENT AND OTHER DISCRIMINATION.

Schools can use a wide array of interventions to address race-based peer harassment and other discrimination and protect students' educational opportunities. When encountering behavior that implicates civil rights laws like Title VI and the Equal Protection Clause, school administrators can look beyond exclusionary disciplinary measures for the perpetrators. Instead, schools can employ many tools

after learning that there is a harassment problem at the school. These tools include trainings for students, staff, and families; restorative practices; educational accommodations for victims; mental health supports for victims and harassers; safety plans; public statements; policy changes; and adopting or adjusting the curriculum to educate students and address the root causes of harassment or other discrimination.

### A.    Schools can provide meaningful training to address the harassment or other discrimination at issue.

Training for staff, students, and the broader school community by qualified experts about harassment and other discrimination can help prevent incidents of discrimination and build an environment where staff and students know how to spot and address it. Trainings can take many forms and can include information for staff about how to identify and address discrimination, training for students on what discrimination is and its root causes, and training for students and their families on their rights at school and what to do if they face harassment or other discrimination.

Regular training for staff on school policies and how to identify and address harassment is crucial for effective enforcement. Policies have little effect if staff are unaware of them or ignorant of how to implement them. U.S. Dep't of Ed., Office for Civil Rights, *Part II: Step-by-Step Guidance: Creating a Supportive School Climate that Appreciates Racial, Cultural, and Other Forms of Diversity* (Jan. 1999) ("*Step-by-Step                                                                        Guidance*"),

https://www2.ed.gov/offices/OCR/archives/Harassment/climate1.html ("Fully explain to . . . staff how to identify prohibited harassment and how to use the complaint procedures."). Staff training can include a review of the school's anti-discrimination policies and procedures; the type of conduct that constitutes discrimination, which includes harassment; its root causes; and the negative impact that such conduct can have on students, staff, and the educational environment. Teachers and staff should understand their obligation to respond to and report harassment, how to take effective action to end it, prevent its recurrence, and as appropriate, remedy its effects. *See Settlement Agreement Between the United States of America and the Falcon School District 49* ("*Falcon Settlement Agreement*"), ¶ 30 (Oct. 14, 2014), https://www.justice.gov/sites/default/files/crt/legacy/2014/10/21/falcon49agree.pdf.

Mandatory training for harassers and the larger school community that addresses the specific harassment or other discrimination at issue is a remedial action that could address a racially hostile environment. *See Zeno*, 702 F.3d at 668-69. The training may include inviting external groups like the NAACP or human rights organizations to teach or workshop culturally relevant material. *Id.* at 670. Like in *Zeno*, the Fourth Circuit in *Feminist Majority Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018), found that the school could have conducted a mandatory assembly for the student body to discuss the issue of harassment or discrimination and make clear

9

that such behavior whether at school or online is discouraged. 911 F.3d at 693; *see also* Russlynn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter, p. 4 (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf ("A more effective response would have included" more systemic changes like school-wide trainings on "constructive responses to racial conflict, hosting class discussions about racial harassment and sensitivity to students of other races, and conducting outreach to involve parents and students in an effort to identify problems and improve the school climate.").

General know-your-rights training on harassment and other discrimination can also help prevent harassment from occurring or ensure it is handled in a prompt and effective manner. Students can be given information on how to respond to harassment and other discrimination when they experience or witness it, how school personnel are expected to respond, and the options available to them and their families if they experience harassment. *See Falcon Settlement Agreement*, *supra*, ¶ 31. Training programs are adaptive tools that a school can employ strategically with a goal to end the harassment and deter future harassment and other discrimination.

**B.    Restorative practices, including conferencing with students, families, offenders, and other stakeholders can be effective at**

**recognizing and repairing the harm caused by harassment or other discrimination.**

Restorative justice practices are non-disciplinary tools to address the harm experienced from racial or other forms of discrimination with a goal of repairing relationships and ending the harmful behavior. Luke Roberts, Restorative Justice Council, *Racism in the Playground: A Restorative Justice Response*, https://restorativejustice.org.uk/blog/racism-playground-restorative-response (last visited Aug. 14, 2024). Michigan law encourages the use of restorative practices in educational institutions and requires its use as a "first consideration to remediate offenses such as interpersonal conflicts, bullying, verbal and physical conflicts . . . and harassment and cyberbullying." Mich. Comp. Laws § 380.1310c(2).

Such practices may include victim-offender conferences initiated by the victim and approved by their parents or guardians, and can include victim advocates, the offender, members of the school community, and supporters of the victim and the offender. *Id*. Conferences "provide an opportunity for the offender to accept responsibility for the harm caused to those affected by the misconduct and to participate in setting consequences to repair the harm." *Id*. Administrators have a chance to hear from all parties involved in a dispute and the larger school community. Students who have been harmed have an opportunity to express themselves and their feelings, and students who engaged in the harassing behavior have an opportunity to listen and understand the emotional and personal damage

done while also recognizing that they belong to a community. Roberts, *supra*. The attendees, known as the restorative practices team, "may require the pupil to do 1 or more of the following: apologize; participate in community service, restoration or counseling; or pay restitution." Mich. Comp. Laws § 380.1310c(2). An agreement is drafted that incorporates the selected consequences and time limits for completion of the consequences signed by all participants. *Id*.

Whereas discipline targets the harasser for unwanted behavior and exclusion from the school environment, restorative approaches address race-based harassment and other discrimination "through understanding all perspectives when addressing the situation, including parents and the community." Roberts, *supra*. "A school's authority over its students is not limited to the extreme case of suspension or expulsion—a school is also permitted to exercise 'restorative practices' designed to 'repair[ ] the harm to the victim and the school community caused by a pupil's misconduct.'" *Doe v. Alpena Pub. Sch. Dist.*, 3 N.W.3d 838, 843 (Mich. Ct. App. 2022) (quoting Mich. Comp. Laws § 380.1310c(3)(b)), *rev'd*, __ N.W.3d __, 2024 WL 3573522 (Mich. 2024). Restorative practices can be used as an alternative or in addition to suspension or expulsion or in lieu of exclusionary discipline. Mich. Comp. Laws § 380.1310c(1).

Guides exist to help schools implement restorative justice practices as one way to build relationships, address conflicts, and begin to reduce reliance on

exclusionary discipline. *See* Center for Justice Innovation, *Restorative Justice in Schools: A Whole-School Implementation Process* (April 2021), https://www.innovatingjustice.org/sites/default/files/media/document/2021/Guide_RJ_Implementation_04052021.pdf.

### C. Educational remedies, mental health support, and safety plans are ways to help victims preserve educational opportunities despite the harassment.

Schools can respond to harassment by providing victims with educational supports, including accommodations, mental health counseling, and safety plans, to remedy the effects of the discrimination and ensure equal access to educational opportunities. Educational remedies for victims are especially important "if the school initially delays in responding or responds inappropriately or inadequately to information about harassment." Ali, Dear Colleague Letter, p. 3.

Examples of educational accommodations for victims include excusing the victim from class if they express concerns about participating, time extensions on assignments, and retaking tests. *See Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 967 (6th Cir. 2020). Schools can also offer tailored accommodations that address the specific educational or professional harms caused by the harassment. For example, in *Foster*, when the victim "explained the damage the harasser wrought on her networking prospects, the University banned him from future networking events." *Id*. Approving a request to transfer to a different school may also be

13

appropriate in certain circumstances. *See Doe v. District of Columbia*, 694 F. Supp. 3d 20, 35 (D.D.C. 2023).

In cases where harassment poses a threat to another students' safety, a school can minimize those harms and make sure the victim can still take full advantage of her educational opportunities. A school can remove harassers from the classroom or change the victim's classes, *see Doe v. Ohio Univ.*, No. 2:21-cv-858, 2022 WL 899687, at *6 (S.D. Ohio Mar. 28, 2022); offer counseling services and an overall safety plan, *see Doe v. District of Columbia*, 694 F. Supp. 3d at 35; ensure full separation of harasser and victim with additional security measures, *see Foster*, 982 F.3d at 970; and/or assign a paraeducator or shadow to the victim to ensure the student's safety and a witness for any future acts of harassment, *see S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir. 1999) (immediately upon learning of sexual assault, school installed windows in special education classroom, placed an aide in the plaintiff's classroom, and offered increased supervision, among other accommodations).

Counseling can also be a helpful component of any remedial action plan to ameliorate the emotional and/or physical toll on students. *Doe v. District of Columbia*, 694 F. Supp. 3d at 35 (school recommended providing victim with counseling services); *Feminist Majority Found.*, 911 F.3d at 693 (university could

14

have offered counseling services for those impacted by the targeted harassment); Ali, Dear Colleague Letter, p. 3 ("Appropriate steps to end harassment may include . . . providing counseling for the target and/or harasser . . . ."); *Soper*, 195 F.3d at 855 (school created student counseling sessions on how to function socially with the opposite sex in response to a sexual assault incident).

### D. A historically accurate curriculum that teaches and affirms the diversity of students and the world can be effective at addressing a hostile educational environment.

A culturally responsive and historically accurate curriculum can help schools prevent harassment and other discrimination and reduce a school's exposure to liability under federal civil rights laws. Many educators have seen the value of adopting what is generally known as a multicultural curriculum to fill gaps in knowledge or teach students about people of other races. That curriculum may come in many forms, depending on a particular school's context and needs. *See* Christy Byrd, *Does Culturally Relevant Teaching Work? An Examination From Student Perspectives*, Sage Open (July 2016), https://journals.sagepub.com/doi/10.1177/2158244016660744. At heart, a multicultural curriculum should be one that "promote[s] harmony, inclusion, mutual coexistence, and acceptance of individuals from different racial, ethnic, political, and educational backgrounds with varied views and understanding of the society." Ekene Francis Okagbue, et al., *Does School Bullying Show Lack of Effective Multicultural Education in the School Curriculum?*,

Int'l J. Educ. Rsch. Open (June 2022), https://www.sciencedirect.com/science/article/pii/S2666374022000541. "It is important that teachers balance celebrations of diversity with discussions of historical and contemporary racism. When students perceived their teachers as explicitly engaging with social issues and the role of race in society, they were more aware that racism exists." Byrd, *supra*.

"The understanding of multiculturalism is not only on identifying the culture, ethnic groups, and different racial backgrounds in the society but also on the knowledge of human connections, human feelings, and brotherhood. The affectionate dimension of multiculturalism reduces the bullying tendencies in the students." Okagbue, *supra*. Indeed, studies show that "exposure to racial and ethnic diversity is associated with a reduction in bullying reports." Nicholas Gage, et al., *School Climate and Bullying Victimization: A Latent Class Growth Model Analysis*, Sch. Psych. Q., 256-71 (2014); *see* Isabella Lanza, et al., *A Silver Lining: The Role of Ethnic Diversity on Co-occurring Trajectories of Weight Status and Peer Victimization Across Early Adolescence*, J. Adolescent Health, 554-60 (2018) (same). Conversely, students' harassing conduct, and the beliefs or motivations underlying that conduct, can indicate that there is a failure of effective education in the curriculum.

E.    **Monitoring and assessing the effectiveness of remedial actions and anti-harassment/discrimination efforts can ensure that a school district is responsive to circumstances as they evolve.**

Monitoring and assessing the effectiveness of anti-harassment/discrimination efforts is critical to reducing harassment and other discrimination in schools. "In order to ensure that its policies and procedures are consistently followed, a school will normally need to create and maintain documentation of all harassment incidents, including notations as to how the harassment was addressed. The record-keeping system should be sufficient to allow the district to monitor district schools for repetition of harassing behaviors and to determine if institutional remedies are needed to address patterns of harassment and prevent future incidents." *Step-by-Step Guidance*, *supra*. Several guides exist for schools endeavoring to design an assessment and monitoring system. *See Falcon Settlement Agreement*, ¶ 34; Minneapolis Public School District, *Equity and Diversity Impact Assessment* (Apr. 2024), https://sites.google.com/mpls.k12.mn.us/mpsedia/home; Jefferson County Public School District, *Racial Equity Analysis Protocol*, https://www.jefferson.kyschools.us/page/racial-equity-analysis-protocol.

Sometimes, monitoring may reveal that a school's policies are ineffective and require revision. *See* Ali, Dear Colleague Letter, p. 3 (explaining "[a]n effective response also may need to include the issuance of new policies against harassment and new procedures by which students, parents, and employees may report

17

allegations of harassment"). In those circumstances, schools can call on the guidance of experts, who can help schools reevaluate their policies. *Feminist Majority Found.*, 911 F.3d at 693.

### III. A JURY COULD FIND THE DISTRICT VIOLATED FEDERAL LAW BECAUSE IT FAILED TO TRY SOMETHING NEW WHEN ITS RESPONSE PROVED INEFFECTIVE.

In this case, a jury could find that the District was deliberately indifferent because it failed to try new remedial measures when it learned that its initial strategy—sporadic discipline of individual harassers—was ineffective. By the spring of 2020, the District had received multiple complaints from the Malicks about the harassment, and the fact that students continued to target C.M. despite occasional discipline. Plaintiffs-Appellants' Brief, R. 32, Appendix A. And by the fall, the District knew that the Malicks had elected to homeschool C.M. for eighth grade to protect her from "racial bullying and abuse." Malick Dep., R. 49-8, Page ID # 2174; Gilbertson Dep., R. 49-6, Page ID #1825; Wood Dep., R. 49-12, Page ID # 2745. When C.M. returned to the District for ninth grade, her parents met with officials to ensure they were aware of the problems that had driven her out of school, and to request basic measures to stop the problem from reoccurring. Mills Dep. R. 49-11, Page ID # 2598, 2652, 2366-68; A. Malick Dep., R. 49-8, Page ID # 2156-57; Wood Dep., R. 49-12, Page ID # 2740-41. Yet the District took no action. It did not train staff or students on racial harassment, it did not separate C.M. from her harassers, it

did not even, at minimum, alert C.M's teachers of the harassment or ask for them to watch out for her. And, unsurprisingly, the harassment continued. Def. MSJ Ex. 22, R. 31-1, Page ID # 746-48; Malick Notes, R. 50-4; G.S. Docs, R. 51-8; A.S. Docs, R. 51-4; D.P. Docs, R. 51-7; H.P. Docs, R. 51-9; J.S. Docs, R. 51-10; A.M. Docs, R. 51-3. Indeed, the District's discipline not only failed to stop the harassment but enabled its perpetrators, who bragged and joked about the schools' tolerance for their misbehavior. Wood Dep., R. 49-12, Page ID # 2868.

This case is strikingly similar to *Zeno*, where the Second Circuit held a reasonable jury could find a school was deliberately indifferent to racial harassment. *See supra* p. 3. Like the school in *Zeno*, the District knew the student discipline it had imposed was ineffectual at stopping the harassment—and even, in some cases, emboldened the harassers. Plaintiffs-Appellants' Brief, R. 32, Page ID # 54-55. Like the school in *Zeno*, the District nonetheless dragged its feet to try additional remedies. *Id.*, Page ID # 56-58. Like the school in *Zeno*, the District turned down an offer from the local NAACP to provide education to end the harassment, and instead offered generic trainings on inapt topics. *Id.*, Page ID # 59. It did not try any of the other possible interventions discussed above. *See supra* Part II. And as with the school in *Zeno*, a jury could find the District was deliberately indifferent.

The district court was wrong to conclude that a jury could not find the District was deliberately indifferent because it disciplined some of C.M.'s harassers. In

reaching its conclusion, the district court erroneously assessed the effectiveness of the District's response by whether it stopped the specific disciplined harassers from specifically targeted C.M, asserting that "the deliberate indifference formulation individualizes the harassment as being directed to the same victim." Opinion, R. 67, Page ID # 4232. That is wrong as a matter of law and a matter of fact.

For starters, the district court's "individualization" of the deliberate indifference element was based on precedent inapplicable to this case. The district court rooted this requirement in *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613 (6th Cir. 2019). Opinion, R. 67, Page ID # 4232. There, this Court held that a Title IX plaintiff must demonstrate that her school's deliberate indifference caused her to experience additional sexual harassment, and instructed that she could not satisfy this requirement with "conduct by the perpetrator directed at third parties." *Kollaritsch*, 944 F.3d at 621-22, 623-24 (cleaned up). But "*Kollaritsch* . . . does not apply to students in high school." *Doe ex rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 467-68 (6th Cir. 2022). So, it has no bearing on this case.

And "[i]t is well-established that incidents of racial harassment that a plaintiff learns of secondhand and did not personally experience may 'contribute to a[n] . . . environment that was hostile.'" *Strickland v. City of Detroit*, 995 F.3d 495, 504 (6th Cir. 2021) (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999)).

"[R]acial epithets need not be hurled at the plaintiff in order to contribute to" the racially hostile environment she suffers. *Jackson*, 191 F.3d at 661. For that reason, the district court was wrong to judge the District's effectiveness by whether it prevented "specific incidents of racial harassment *of C.M.*" Opinion, R. 67, Page ID # 4234 (emphasis added); *see id.*, R. 67, Page ID ## 4211-4221. District students' ongoing and widespread use of the "n-word," for example, created a hostile environment for C.M., even though the slur was not always directed at her. Plaintiffs-Appellants' Brief, R. 32, Appendix A.[2]

Moreover, even if the district court were right about the law, the Malicks could meet that standard. They repeatedly reported to the District that students—including the same harassers—continued to target C.M. after the District received notice. When the Malicks notified school administrators about the past and ongoing harassment, the school took no actions that reduced or eliminated the harassment against C.M. and as such, can be found to be deliberately indifferent to the racial harassment C.M. faced and the racially hostile educational environment she was forced to endure.

---

[2] Conversely, if a widespread hostile environment continues unchecked, a school will not necessarily escape a finding of deliberate indifference just because it stops some individual students from continuing their harassment. In *Zeno*, for example, some individual harassers stopped but were quickly replaced by others, demonstrating the ineffectiveness of the school's response. *See Zeno*, 702 F.3d at 662, 668-71.

21

## CONCLUSION

This Court should reverse the judgment of the district court and remand for trial.

Respectfully submitted,

/s/ *Bonsitu Kitaba-Gaviglio*
Bonsitu Kitaba-Gaviglio
Daniel S. Korobkin
American Civil Liberties
   Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI  48201
(313) 578-6800
bkitaba@aclumich.org

Counsel for Amicus Curiae

Dated: August 15, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 4,920 words, excluding the parts of the brief exempted by Rule 32(f).

/s/ *Bonsitu Kitaba-Gaviglio*
Bonsitu Kitaba-Gaviglio

## CERTIFICATE OF SERVICE

On August 15, 2024, I caused this brief to be filed using the court's electronic filing system, which will serve electronic notice of such filing to all counsel of record.

/s/ *Bonsitu Kitaba-Gaviglio*
Bonsitu Kitaba-Gaviglio