No: 24-1147

_____

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

APRIL MALICK, ROB MALICK, and C.M.

Plaintiffs-Appellants

v.

CROSWELL-LEXINGTON DISTRICT SCHOOLS, CROSWELL-LEXINGTON
BOARD OF EDUCTATION, DAN GILBERTSON and KYLE WOOD

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Eastern District of Michigan
Docket No. 22-cv-11126
The Honorable David M. Lawson

_____

## PLAINTIFFS-APPELLANTS' CORRECTED BRIEF
(*Corrected as to typographical errors only*)

## ORAL ARGUMENT REQUESTED

Deborah L. Gordon
Elizabeth Marzotto Taylor
Sarah Gordon Thomas
DEBORAH GORDON LAW
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, MI 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com

Attorneys for Plaintiffs-Appellants                    Dated: August 19, 2024

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-1147                    Case Name: Malick v Cros-Lex District Schools et al

Name of counsel: Deborah L. Gordon

Pursuant to 6th Cir. R. 26.1, April Malick, Rob Malick, and C.M.
                              *Name of Party*
makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

---

CERTIFICATE OF SERVICE

I certify that on _____ March 8, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Deborah L. Gordon
(248) 258-2500
dgordon@deborahgordonlaw.com

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. v

STATEMENT IN SUPPORT OF ORAL ARGUMENT ................................................ ix

STATEMENT OF JURISDICTION ................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW.............................. 2

SUMMARY OF THE ARGUMENT.................................................................. 3

I.      Statement of the Case.................................................................... 5

    A.      Procedural History ............................................................ 5

    B.      Background ......................................................................... 5

    C.      The District tolerated pervasive racism to which it was deliberately indifferent.................................................... 5

    D.      The school gave lengthy suspensions for vaping but not for racial harassment............................................................. 11

    E.      The school had no mandatory race discrimination training for students................................................................. 12

    F.      The school had little to no mandatory teacher training on race discrimination .............................................................. 15

    G.      The school failed to follow its own policies on race discrimination.......... 16

    H.      Reported incidents of racial harassment directed at C.M........................... 19

        i.      Racial harassment of C.M. in Middle School ................................... 19

        ii.     Racial harassment of C.M. in High School....................................... 25

    I.      The Board had a custom of failing to respond to the harassment............. 39

J.    C.M. was forced out of the district because of racial bullying...................41

II.    Legal Standard .............................................................................................42

III.    Legal Argument ...........................................................................................42

A.    The district court failed to view the facts in the light most favorable to the plaintiff ...............................................................................42

B.    Title VI Deliberate Indifference ...................................................43

i.    The school continued to give the same, ineffective, low-level suspensions when it knew its practices were not working .............43

ii.    Defendant's half-hearted non-disciplinary remedial measures changed nothing.....................................................................48

iii.    The school's "widespread" problem of racial harassment was a "known circumstance" that the district court ignored.................50

iv.    The district court ignored clear evidence of deliberate indifference .................................................................................56

v.    *Foster* and *Stiles* are not proper comparators......................................58

IV.    Equal Protection Claim ...............................................................................61

A.    The municipality had a custom of deliberate indifference .........................61

B.    Wood and Gilbertson are not entitled to qualified immunity in their "personal" capacity...................................................................65

V.    Plaintiffs Have Cognizable Non-Emotional Distress Damages ........................67

VI.    Plaintiffs have established a direct liability claim under the Elliot Larsen Civil Rights Act .............................................................................68

VII.    Conclusion And Relief Requested ........................................................69

iv

# TABLE OF AUTHORITIES

## Cases

*Arceneaux v. Vanderbilt Univ.,*
   25 Fed.Appx. 345 (6th Cir.2001) ............................................................... 53, 54

*Brooks v. Skinner,*
   139 F. Supp. 3d 869 (S.D. Ohio 2015) .............................................. 46, 53, 68

*Brown v. Shaner,*
   172 F.3d 927 (6th Cir. 1999) ..................................................................... 65

*City of Canton v. Harris,*
   489 U.S. 378 (1989) ............................................................................... 64, 65

*Crandell v. New York Coll. of Osteopathic Med.,*
   87 F. Supp. 2d 304 (S.D.N.Y. 2000) ......................................................... 55

*Cummings v. Premier Rehab Keller, PLLC,*
   142 S. Ct. 1562 (2022) ............................................................................... 68

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
   526 U.S. 629 (1999) ................................................................................... 44

*Defoe ex rel. Defoe v. Spiva,*
   625 F.3d 324 (6th Cir. 2010) ....................................................................... 9

*DiStiso v. Cook,*
   691 F.3d 226 (2d Cir. 2012) ......................................................................... 6

*Doe ex rel. Kolokithas v. Alpena Pub. Sch. Dist.,*
   No. 165441, 2024 WL 3573522 (Mich. July 29, 2024) ........................... 68, 69

*Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee,*
   35 F.4th 459 (6th Cir. 2022) ....................................................................... 59

*Doe v. Claiborne Cnty.,*
   103 F.3d 495 (6th Cir.1996) ....................................................................... 63

*Doe v. Forest Hills Sch. Dist.,*

No. 1:13-CV-428, 2015 WL 9906260 (W.D. Mich. Mar. 31, 2015)........................... 68

*Doe v. Sch. Dist. No. 1, Denver, Colorado*,
   970 F.3d 1300 (10th Cir. 2020).................................................................................. 46

*E.E.O.C. v. Ralph Jones Sheet Metal, Inc.*,
   777 F. Supp. 2d 1119 (W.D. Tenn. 2011) ...................................................................... 7

*Flores v. Morgan Hill Unified School Dist.*,
   324 F.3d 1130 (9th Cir. 2003) ................................................................................... 68

*Foster v. Bd. of Regents of Univ. of Michigan*,
   982 F.3d 960 (6th Cir. 2020)...........................................................................passim

*Fulton v. W. Brown Loc. Sch. Dist. Bd. of Educ.*,
   No. 1:15-CV-53, 2015 WL 3867243 (S.D. Ohio June 23, 2015) ........................ 63, 64

*Garter-Bare Co. v. Munsingwear, Inc.*,
   650 F.2d 975 (9th Cir. 1980)..................................................................................... 43

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998).............................................................................................44, 55

*K.C. by & through T.C. v. Bd. of Educ. of Marshall Cnty. Sch., Benton, Kentucky*,
   306 F. Supp. 3d 970 (W.D. Ky. 2018) ................................................................3, 4, 45

*Kollaritsch v. Michigan State Univ. Bd. of Trustees*,
   944 F.3d 613 (6th Cir. 2019)..................................................................................51, 52

*Lehman Bros. v. Schein*,
   416 U.S. 386 (1974)................................................................................................... 69

*Martin v. Swartz Creek Cmty. Sch.*,
   419 F. Supp. 2d 967 (E.D. Mich. 2006) ..................................................................... 46

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574, 587 (1986) .......................................................................................... 43

*McCoy v. Board of Educ., Columbus City Sch.*,
   515 Fed. Appx. 387 (6th Cir.2013) ............................................................................ 63

*Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Doe,*
    143 S. Ct. 574, 214 L. Ed. 2d 340 (2023) ....................................................... 59

*Monell v. Dep't of Soc. Servs. of City of New York,*
    436 U.S. 658 (1978)......................................................................................62, 63

*Murrell v. School District No. 1, Denver,*
    186 F.3d 1238 (10th Cir. 1999) ....................................................................... 67

*Pahssen v. Merrill Cmty. Sch. Dist.,*
    668 F.3d 356 (6th Cir. 2012)......................................................................51, 54

*Patterson v. Hudson Area Sch.,*
    551 F.3d 438 (6th Cir. 2009)....................................................... 43, 48, 53, 56

*Pearson v. Callahan,*
    555 U.S. 223  (2009) ......................................................................................... 65

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986)......................................................................................63, 64

*Schroeder ex rel. Schroeder v. Maumee Bd. of Educ.,*
    296 F. Supp. 2d 869 (N.D. Ohio 2003).......................................................... 63

*Shively v. Green Loc. Sch. Dist. Bd. of Educ.,*
    579 F. App'x 348 (6th Cir. 2014) ............................................... 16, 64, 66, 68

*Stiles ex rel. D.S. v. Grainger Cnty., Tenn.,*
    819 F.3d 834 (6th Cir. 2016)........................................................ iv, 59, 61, 62

*SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.,*
    33 F.4th 872 (6th Cir. 2022) ........................................................................... 43

*Theno v. Tonganoxie Unified Sch. Dist. No. 464,*
    377 F.Supp.2d 952 (D.Kan.2005) .................................................................. 48

*Vance v. Spencer Cnty. Pub. Sch. Dist.,*
    231 F.3d 253 (6th Cir. 2000)........................................................................4, 45

*Wamer v. Univ. of Toledo,*
    27 F.4th 461 (6th Cir. 2022) ........................................................................... 58

*Williams ex rel. Hart v. Paint Valley Loc. Sch. Dist.*,
   400 F.3d 360 (6th Cir. 2005) ................................................................ 62

*Williams v. Port Huron Sch. Dist.*,
   455 Fed. Appx. 612 (6th Cir.2012) ................................................ 63, 66, 67

*Zeno v. Pine Plains Cent. Sch. Dist.*,
   702 F.3d 655 (2d Cir. 2012) ...................................................... 45, 46, 49, 50

## Statutes

28 U.S.C. § 1291 ....................................................................................... 1
28 U.S.C. § 1331 ....................................................................................... 1
28 U.S.C. § 1367 ....................................................................................... 1
42 U.S.C.A. § 1983 ............................................................................... vi, 1
42 U.S.C.A. § 2000d ......................................................................... 1, 55
Civil Rights Act of 1964 § 601 ........................................................... 1
Equal Protection Clause, U.S. Const. Amend. 14, § 1 ....................... 1
Michigan's Elliot-Larsen Civil Rights Act, MCL 37.2402(a) ..... 1, 65

## Rules

6 Cir. R. 34 ............................................................................................... vi

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants request oral argument, pursuant to 6 Cir. R. 34, as they believe it could significantly aid the decisional process in this case. The purpose of the request for oral argument is to emphasize and clarify the argument in the briefs, particularly in light of the evolving case law as to Title VI, §1983, and "deliberate indifference", and the fact intensive nature of this analysis.

## STATEMENT OF JURISDICTION

Plaintiffs Rob and April Malick, and their minor daughter, C.M., filed suit against the Defendants Croswell-Lexington District Schools, Croswell-Lexington Board of Education, Superintendent Dan Gilbertson, and Principal Kyle Wood under Title VI of the Civil Rights Act of 1964 § 601, 42 U.S.C.A. § 2000d, Equal Protection Clause, U.S. Const. Amend. 14, § 1; 42 U.S.C.A. § 1983, and the Michigan Elliot-Larsen Civil Rights Act, MCL 37.2402(a). The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. The district court granted summary judgment to Defendants on all claims on February 20, 2024. **R. 67**. Plaintiffs timely filed a notice of appeal on February 23, 2024. **R. 69**. This Court has jurisdiction under 28 U.S.C. § 1291.

1

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred by making incorrect and impermissible findings of material facts and failing to view the facts and all inferences in the light most favorable to the Plaintiffs.

2. Whether the district court erred by finding that all of Plaintiffs' claims fail because "the evidence in this case does not create a triable issue of deliberate indifference by the defendants to the plaintiffs' complaints of racial harassment."

3. Whether the district court erred by finding that as to the 42 USC 1983 claim, Plaintiff did not make out an actionable claim as to misconduct by any school officials.

4. Whether the district court erred by improperly granting the individual Defendants qualified immunity.

## SUMMARY OF THE ARGUMENT

This is a case about race discrimination pursuant to Title VI of the Civil Rights Act of 1964, the Equal Protection Clause, 42 U.S.C.A. § 1983, and the Michigan Elliot-Larsen Civil Rights Act, MCL 37.2402(a). Plaintiffs are C.M., a student, and her parents. C.M. is Black and was adopted by her two White parents at the age of 13 months old. Defendant is the Crosswell Lexington School District, its Board and two administrators. At the time of these events (2018-2022) C.M. was one of approximately four Black students in a student body of roughly 1,950.

Defendants allowed a pervasive, widespread culture of student-on-student racism to exist. It was a general background to the school day and included display of Confederate flags and Nazi symbols, open use of the n-word, and other racist language. This conduct was directed to C.M. and she observed it regularly. This was known to the school board and the administrators.

Defendants were deliberately indifferent to the racism. During the time C.M. was in attendance, the school logged 83 specific incidents of racism. The district court incorrectly excluded the dozens of reports of racial harassment as to third parties in the analysis of deliberate indifference. Pursuant to recent Sixth Circuit caselaw, this is error. *See S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 714 (6th Cir. Nov. 15, 2023).

In "deliberate indifference cases", applicable to both Title VI and §1983, the Sixth Circuit's focus has always been "whether the school could have or should have done [things] differently in order to bring the ... harassment to a *stop*." *K.C. by & through*

3

*T.C. v. Bd. of Educ. of Marshall Cnty. Sch., Benton, Kentucky*, 306 F. Supp. 3d 970, 982 (W.D. Ky. 2018), *aff'd sub nom. K.C. by & through T.C. v. Wamer Marshall Cnty. Bd. of Educ.*, 762 F. App'x 226 (6th Cir. 2019) (emphasis in original). A school that takes some action, including issuing suspensions, is still "deliberately indifferent" when it has "actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail[.]" *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000); *Metro. Gov't of Nashville*, 86 F.4th at 714.

With only two or three exceptions, Defendants refused to do more than give the minimum level of discipline to offenders. Progressive discipline was not utilized with repeat offenders. Some students were not disciplined at all. Despite being urged to do so, the Board refused to provide mandatory training to students, and there was virtually no training for staff. The facts support that the school's lack of action amounted to a "custom" or practice" in violation of the Equal Protection Clause.

The district court clearly erred by holding that under the voluminous facts presented a reasonable jury could not find that the school was deliberately indifferent. In doing so, the court failed to view the evidence and draw all inferences in favor of the Plaintiffs, and it made findings of fact in Defendants' favor.

It is uncontested that the harassment never stopped. Plaintiff C.M. was eventually forced out of the school district by racial harassment. She re-enrolled in a school much farther from her home—the very result Title VI seeks to prevent.

## I.    Statement of the Case

### A.    Procedural History

On May 23, 2022, Plaintiffs-Appellants C.M., and her parents April and Rob Malick, filed their complaint in this matter alleging violations of Title VI, the Equal Protection Clause, and Michigan's Elliot-Larsen Civil Rights Act (ELCRA), all based on Defendants' deliberate indifference to the known problem of widespread racial harassment at Croswell Lexington School. The District Court granted summary judgment to Defendants-Appellees on all claims on February 20, 2024. **R. 67**. Plaintiffs now appeal. **R. 69**.

### B.    Background

Plaintiff C.M. is Black. In 2008, at thirteen months old, she was adopted by her two white parents, April and Rob Malick. The Malicks live in Sanilac County. In 2022, the County was 96% white and 0.7% Black, per the U.S. Census Bureau. In 2018, C.M. was enrolled in the essentially all white Croswell Lexington School District (referred to as "Croslex"). The district reflected the County; while C.M. was enrolled at the High School, there were three Black students, total, out of roughly 650. See **Enrollment Data, R. 50-16; Wood Dep, R.49-12,** PageID# 2779.

### C.    The District tolerated pervasive racism to which it was deliberately indifferent

Deliberate indifference may lie under Title VI and § 1983 where the response to the harassment is unreasonable in light of the "known circumstances," including when a district is "indifferent to the problem of pervasive [racial] misconduct in schools[.]"

5

*S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 715 (6th Cir. Nov. 15, 2023). The district court incorrectly focused only on the conduct directed to C.M. and did not consider the known circumstance of pervasive racism throughout the school. Nor did the court consider the reports of racism made by other students. This is wrong as a matter of law, as set forth more fully, *infra*, at pg. 53.

Abject racism was practiced openly by students and some employees in the district. Much of this conduct was observed by the administration and/or reported to them. There were 70 complaints of race discrimination as to individual harassers reported between the 2018- 2022 school years, despite there being only three Black students enrolled at the school. **Reports of Racial Harassment, Appendix A**; See **Enrollment Data, R. 50-16.**

The n-word was used with impunity throughout school. Out of the 70 reported incidents, dozens were related to use of the n-word, including one student calling President Obama a "stupid nigger", and other students "continually" using the word "nigger." **Appendix A**. Courts have recognized the significance of the n-word. *Brooks v. Skinner*, 139 F. Supp. 3d 869, 882 (S.D. Ohio 2015).*See also DiStiso v. Cook,* 691 F.3d 226, 242–43 (2d Cir. 2012), citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. at 652, 119 S.Ct. 1661 ("Defendants do not—and cannot—dispute that such conduct, particularly use of the reviled epithet "nigger," raises a question of severe harassment). "Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African–Americans…Perhaps no single act can more quickly create an

abusive…environment than the use of an unambiguously racial epithet such as 'nigger.'
*E.E.O.C. v. Ralph Jones Sheet Metal, Inc.,* 777 F. Supp. 2d 1119, 1124 (W.D. Tenn. 2011)
(collecting cases).

C.M. observed rampant use of the n-word by students in front of teachers and
administrators loud enough for them to hear. **C.M. Affidavit, R. 49-13**. The students
were rarely told to stop. She testified that she did not feel safe at school. **Id.**; **C.M. Dep,
R. 49-9**, PageID# 2332.

Student E.F. said she heard the n-word used by many students regularly on
school property—in the classrooms, hallways, lunchroom, and other areas of the
school. **E.F. Affidavit, R. 49-15**. The n-word was used when school was in session and
before and after school. It was a regular part of many students' vocabulary. **Id**. It was
said in front of teachers, substitute teachers, and administrators loud enough for them
to hear. It usually went unaddressed. **Id**. E.F. heard students make jokes about slavery
and heard Black students referred to as 'farm equipment', in reference to southern
plantations, during class when the teacher was in the room. **Id.** E.F. reported the above-
described conduct to the Assistant Principal of the High School, Lisa Burns. Burns said
there was nothing the school could do unless the school heard it. **Id**

Students openly mocked what happened to George Floyd in May of 2020. **C.M.
Dep, R. 49-9**, PageID# 2393. There was a "trend" among students called "The George
Floyd" where they posted pictures online of them kneeling on a friend's neck. **Id.** C.M.
testified that "George Floyd was consistently talked about at school as being a hoax…

that the cops did not mean it[.]" **Id.** "It was really hard to hear that every single day going into class." **Id.**

One student who was known for "making racist jokes" stated "I'm racist and I'm proud of it" in a classroom in front of a staff member and a student. **R. 51-5**, PageID# 3371, 3372. He added, "my family goes by the saying 'racist and proud.' " **Id.**

The Confederate flag was regularly and openly displayed on school property by students with no consequences. **C.M. Dep, R. 49-9**, PageID# 2407. It was drawn on chalkboards or whiteboards, worn on belt buckles and hats, affixed to students' school laptops, license plates, and flown from students' vehicles. **C.M. Dep, R. 49-9**, PageID# 2385-2386; **See Appendix A**. C.M. testified that she saw the confederate flag regularly. **Id.** Students E.F. and K.B. testified they observed students wearing the confederate flag on T-shirts and sweatshirts to school. They were not required to remove the clothing. **E.F. Affidavit, R. 49-15**; **K.B. Affidavit, R. 49-17**.

In October of 2020, a Black student emailed Superintendent Dan Gilbertson, Principal Kyle Wood, and Lisa Burns, stating, "Daily, I must come to school and see a flag that represents hate for my ethnic group, and I am sick of it!" **10/30/2020 email, R. 50-1**. She attached photos of students wearing the confederate flag. She wrote, "I have gone to both principals to talk about this issue, nothing has changed. It's completely inappropriate for students to behave like this and even more inappropriate and disrespectful for our school to refuse to enforce a rule that bans this flag. It's disturbing my education…I should be able to feel safe in my learning environment."

**Id.** Students continued to use the confederate flag displayed freely on their person and property while at school. Nothing changed.

On June 11, 2021, student A.G. proudly walked into the middle school wearing a full-size confederate flag as a cape:



The Malick family was extremely upset and emailed the school. **A.G. Docs, R. 51-1**, PageID#3286. The student, A.G., received no discipline, or even a verbal warning. She continued to racially harass Black students, including C.M., as set forth below.

The Sixth Circuit has pointed out that that permitting displays of the Confederate flag, including on clothing and belt buckles, could substantially disrupt or materially interfere with the school environment, citing to the "racially inflammatory meaning associated with the Confederate flag'". *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 335 (6th Cir. 2010). Superintendent Gilbertson testified that at Croslex wearing a Confederate flag could be "racially intimidating" to a Black student. **Gilbertson Dep, R. 49-6**, PageID# 1849. Students were never told that wearing or displaying the flag in school was against school rules. **Burns Dep, R. 49-3**, PageID# 1348. In spite of all the

incidents and complaints, there was no policy barring the display of the flag; such a directive was not included in the school handbook or the dress code. **Id**.; **R. 52-7, PageID#3728**. Wood testified that the school would issue periodic reminders about the dress code; but the school never made a statement about the confederate flag. **Wood Dep, R. 49-12**, PageID# 2915. Only one single student received minimum discipline for displaying the confederate flag, despite its rampant presence in the school. **A.D. Docs, R. 51**; see also **Appendix A**.

References to Nazi Germany were extremely common and occurred in front of teachers and staff. The school took no action to stop it. During "Spirit Week," students had a chance to dress up as aspirational figures. C.M. observed that some students dressed up as Hitler. **C.M. Dep, R. 49-9**, PageID# 2386-2387l. See **Appendix A** as to discrete reported incidents. Throughout the school year students would put "smoke or anything black" on their mustache and do the Hitler Salute. **Id**. See e.g., **R. 50-12**.

Students also drew the Nazi symbol on desks and white boards in permanent marker where teachers could see it. **Id.**; **Student Affidavits, R. 49-13, 49-15, 49-16, 49-17**. During history lessons about the Holocaust students said that Hitler was their "idol." **C.M. Dep, R. 49-9**, PageID# 2389. Some performed the Hitler Salute and sang "a Heil Hitler song [and] make jokes about the Holocaust[.]" Other students said they were "following in Hitler's footsteps." **Id.** The Nazi talk was an "everyday thing." **Id**. **C.M. Dep, R. 49-9**, PageID# 2387-2389; **E.F. Affidavit, R. 49-15**. Though the

10

conduct occurred openly in front of staff, the school never addressed this with the student body.

One teacher, Scott Coates, also contributed to the racially hostile environment. Plaintiffs reported his conduct to the school. **Board Meeting Transcript, R. 50-14**, PageID# 3158 at pg. 37; **Wood's Notes, R. 49-21**. Gilbertson and Wood were informed of Coates's conduct. **Gilbertson Dep, R. 49-6**, PageID# 1952-1953. After many years of offensive and harassing comments, Coates was finally given some "redirection" as to how to change his classroom atmosphere but was never disciplined and is still employed by the district. **Id. at** PageID# 1961-1962; **Wood Dep, R. 49-12**, PageID# 2971.

## D. The school gave lengthy suspensions for vaping but not for racial harassment

The school did not make use of its disciplinary options when it came to racial harassment and almost never changed course from giving one-to-three-day suspensions, despite what was permitted in the handbook. The school's student handbook contains a "student discipline code." **Student Handbook, R. 52-7**. There are three procedures to address misconduct: "A" (suspension for up to three days), "B" (suspension for up to five days), "C" (suspension for up to ten days or more, or expulsion) and "D" (mandatory expulsion). Per the policy, the school may use "A," "B," or "C" as discipline for discriminatory harassment. **Id.** at PageID# 3723. Hence,

the school could suspend a student from 0-10 days, or expel a student, for such conduct. **Id**.

The school uses its "discretion" to assign discipline. **Wood Dep, R. 49-12**, PageID# 2812-2814. It may consider "the significance of the wrongdoing," whether the "wrongdoing had affected a student's ability to benefit from an educational program," and the likelihood of stopping the behavior. **Id.** As set forth below, the school almost exclusively issued procedure "A" to address racial bullying, and rarely went above a three-day suspension— including for repeat offenders. **Appendix A**.

On the other hand, students were given a "seven or eight day" out of school suspension for vaping. **Wood Dep, R. 49-12,** PageID#2802. See also **Skyward Discipline Report, R. 52-8**, PageID# 3780 (student given six-day out of school suspension for apparent first-time vaping offense).

As set forth below, the Malicks continually met with school administrators to report student conduct including repeat offenders, ask that the school increase its discipline, and enforce a zero-tolerance policy. None of that occurred.

### E.  The school had no mandatory race discrimination training for students

Principal Kyle Wood, Superintendent Dan Gilbertson, and other administrators, including the "compliance officer", Donna Barrier, admitted that the school provided no mandatory training for students on racial bullying, diversity, inclusivity, race discrimination, or creating a hostile environment based on race. **Gilbertson Dep, R.**

**49-6**, PageID#1914-1917 ("no mandatory training"); **Kyle Wood Dep, R. 49-12**, PageID#2749-2750, 2759, 2761, 2776-2777; **Barrier Dep, R. 49-2**, PageID# 1241; **Lisa Burns dep, R. 49-3**, PageID#1294-1295. Barrier testified that the way to "stop racial bullying is through education of students" and that they "have to be taught." **Barrier Dep, R. 49-2**, PageID# 1238, 1240 (cleaned up). But Barrier admitted that "training was not implemented." **Id**. at PageID#1243.

The district court incorrectly found that the school implemented training in "response to racial issues." **R. 67, PageID#4222**. The training, however, undisputedly did not cover race in any way. The first module was called "Hosts and Guests." See **Habitues Modules, R. 36-9**, PageID#1084. Hosts and Guests "teaches social engagement" and for students to "take the initiative in relationships." **Id**. The module had the students watch an excerpt from the Mr. Rogers's television show and answer a series of questions on his role as a "host." **Id.** The second module was called "Salutes and Snubbs." **R. 52-4**. It had students watch a clip of the movie Ladybird, the story of a high school senior and her strained relationship with her mother. **Id.** Neither program addressed racial harassment. **Mills Dep, R. 49-11**, PageID#2710-2711, 2714-2715. Nor did the "THINK" program cover race or racial bullying. **Wood Dep, R. 49-12**, PageID#2772.

In addition, the courses were implemented after C.M. had permanently left the school. **Melody Mills Dep, R. 49-11**, PageID# 2647 (the Habitues program was implemented sometime between January and May of 2022). Even after Plaintiffs filed

13

this lawsuit, training on race discrimination remained optional. See **June 8, 2022 Email RE Diversity Training, R. 50-20** ("Please click the link below for more information on the optional educational series[.]").

Defendants state that before each school year teachers reviewed the school's handbook, which contained the policy on race discrimination, with the students. The students who testified in this matter did not recall reviewing the school's discrimination policy or covering anything related to race or racial bullying in these meetings. **J.B. Affidavit, R. 49-16; K.B. Affidavit, R. 49-17; E.F. Affidavit, R. 49-15**. They did recall going over other topics like dress code and drugs and alcohol. **Id.**

There is no record that the school obtained student or parent signatures or followed up to ensure they read and understood the discrimination policy, as Defendants argued below. *See also* **Gilbertson Dep, R. 49-6**, PageID# 1920-1923, 1944.

The Malicks offered to personally cover all costs for a diversity and inclusion training for students. **April Malick Dep, R. 49-8**, PageID# 2208-2210; **Rob Malick Dep, R. 49-10**, PageID# 2584-2586. The school declined their offer. **Id**. Kevin Watkins, a representative from the NAACP who the Malicks had reached out to for help, offered to organize training on diversity, inclusion, and race discrimination for students, teachers, and staff at a heavily discounted price. **Id.** at PageID# 2486; **Kevin Watkins Affidavit, R. 49-18**. He discussed the training with Superintendent Gilbertson

and explained that it had been effective in stopping racial harassment in other districts. **Id.** Gilbertson declined his offer. **Id.**

### F.   The school had little to no mandatory teacher training on race discrimination

The district's records prove that, before this lawsuit was filed on May 23, 2022, teachers completed only <u>one</u> course on race discrimination for <u>one</u> year (the 2020-2021 school year), titled "cultural competence and racial bias." **Training Attendance, R. 52-10**.

Former teacher Sara Coronado, who worked at Croswell Lexington from 2016-2023, recalled that the training did not address discrimination, racial bullying, or racial harassment. **Coronado Affidavit, R. 49-19**. She did not recall the training providing any tools to manage students experiencing or perpetrating bullying, harassment, or discrimination based on race. **Id.**

The district added another model after this lawsuit was filed ("DEI practices"). **Training Attendance, R. 52-10**. Ms. Coronado recalled that the training discussed "diversity in general terms." **Coronado Affidavit, R. 49-19**. She did not recall the training giving teachers any tools to manage students experiencing or perpetrating racial bullying, harassment, or discrimination. **Id.**

A current middle school teacher at the District, Heather Shanks, told April on June 29, 2022, "just so you know that equity and discrimination training was a module that we did in an hour by ourselves and it as total [crap] and they didn't have it planned

until the allegations [contained in the federal lawsuit] came out. There was no follow up it was literally just a video we had to watch and only staff maybe even just the teachers I'm not sure." **Heather Shanks messages to April Malick, R. 49-22**; **April Malick Dep, R. 49-8**, PageID# 2296-2297.

### G. The school failed to follow its own policies on race discrimination

The Court can also consider whether Defendant followed their policies on race discrimination when considering deliberate indifference as to Title VI and § 1983 claims. *See Shively v. Green Loc. Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 357 (6th Cir. 2014) ("It is well settled law that departures from established practices", such as those set forth in a school's policies, "may evince discriminatory intent.").

The record shows that those policies were largely disregarded. The written policy has a detailed process on how to handle complaints of race discrimination. **Board of Education Policy, R. 52-5**. It states that any employee who receives an oral or written complaint of discrimination must report it to the "compliance officer." **Id.** at PageID# 3671. It also includes a step-by-step process to be conducted by the "compliance officer," who is to "make recommendations" as to stopping the harassment. **Id.** at PageID# 3671-3675. The process should end with a final decision by the superintendent as to whether "race discrimination" or "harassment' occurred, which is then distributed to the relevant parties. **Id.** at PageID# 3671-3675. All of this must occur within fifteen days of the complaint being made. The school's designated compliance officer was Donna Barrier. **Id.**

16

This process was in name only. Barrier, who reported to Superintendent Gilbertson and the Board of Education, had very little familiarity with the policy and the procedures she was tasked with implementing. **Donna Barrier Dep, R. 49-2,** PageID# 1217, 1231-1232. She could not name a single policy that covered race discrimination. **Id.** at PageID#1244. She was not aware of the specific steps she was required to take upon receipt of a complaint of discrimination. **Id.** at PageID# 1232. She stated that she was "not involved in the details" of reports of race discrimination and did not operate on a specific timeline with complaints. **Id.** at PageID# 1244, 1263.

Barrier was also responsible for reporting the occurrences of race discrimination as required by the state of Michigan. **Id.** at PageID# 1219. This included reporting the number of allegations of race discrimination at the school. **Id.** at PageID# 1263-1264. Barrier denied reporting requisite data as to race discrimination and did not know who did. **Id.**

An unknown person from the District submitted a report to the state representing that there were "sixteen" allegations of racial bullying in K-12 during the 2021-2022 school year. **State of Mich. Report, R. 52-9**. Barrier did not know whether what was reported was correct. **Barrier Dep, R. 49-2,** PageID# 1263-1264. In fact, the number is grossly inaccurate. **CLS Reports of Discrimination, R. 50-21**. Per the school's own records, there were dozens of reports that year. **Id.** A reasonable jury could find that misreporting this information to the state was evidence of guilt as to its handling of racial harassment.

In addition, the school discipline form had a box for incidents of "Harassment, Intimidation, and Bullying" ("HIB"). The box was to be used for any "violations that may result in expulsion", which included racial harassment. Checking this box would have sent a direct message to students. For the most part, that box was not checked, and Principal Wood never checked it. **Appendix A**.

The district court credits the school with starting a "student advisory group to address bullying and school culture." **R. 67, PageID.4221**. Plaintiffs set forth evidence that the advisory group was not formed to address racial bullying, and it had nothing to do with race discrimination or bullying based on race. **Defs' MSJ, R. 32-2**; **C.M. Dep, R. 49-9**, PageID# 2346. Rather, it was a forum for students to discuss "small" issues within the school like "technology, lighting," lunch study hall, whether students were keeping up with coursework, attending classes, etc. **Id.** The district court ignored this evidence. On the other hand, April offered to organize and lead a diversity club at the school, which *would* have been a place for students to discuss racial bullying, increase Black students' morale, and possibly effectuate some change. **Id**.; **April Email re Diversity Club, R. 50-19.** The school declined her offer. The district court does not address this, either.

The district court also gives credit to the school for placing social workers at each building as a remedial measure, i.e., one at the middle school and one at the high school. **R. 67**, PageID#4222. There is no evidence that the social workers were hired in order to curb racial bullying at the school, or what kind of background and training they had

in such matters, if any, and the district court erred by making such a finding. Moreover, the school never encouraged C.M. to utilize the social worker(s) as a resource when she was racially bullied, nor is there any evidence C.M. was aware of such an individual.

### H.   Reported incidents of racial harassment directed at C.M.

Notably, Defendants have never claimed Plaintiffs' complaints of racial harassment were inaccurate or exaggerated. Rather, Superintendent Gilbertson believed that Rob and April Malick and C.M. were "reasonable people." **Gilbertson Dep, R. 49-6**, PageID# 1817. C.M. was first exposed to racial harassment when she entered sixth grade. The racial harassment escalated every year through. Over the 19 months C.M. was in the school, she and/or her parents made a record of approximately 31 complaints of racial harassment as to specific students. **Appendix A**.

### i.   Racial harassment of C.M. in Middle School

In sixth grade, W.H. regularly called C.M. the n-word and made racist jokes "in between every conversation" including calling her a "penguin" because she was Black and her parents white. **C.M. Dep, R. 49-9,** PageID# 2318. She reported this. **Id.** There is no record of any school-issued discipline (Unrelated to the school, W.H.'s parents had him send a letter of apology). **Id.** W.H. went on to racially bully C.M. in high school, including using the n-word, as set forth below.

In seventh grade, C.M. was often harassed about her hair. **Davis Dep, R. 49-3,** PageID#1570. Black hair has historically been fodder for discrimination.[1] School administrators admitted that such bullying is racially charged. **Gilbertson Dep, R. 49-6**, PageID# 1896; **Mills Dep, R. 49-11**, PageID# 2678-2679.

In January 2020, G.D. threatened to "rip" C.M.'s "wig off"—though she did not wear a wig— and have someone video record it. **G.D. Docs, R. 51-14**. Rob reported it to Middle School Assistant Principal Ryan Eugster. Eugster was already aware that Plaintiff had been subjected to bullying. **Eugster Dep, R. 49-5**, PageID# 1664, 1635-1638. Other administrators knew that Plaintiff had been bullied about her "wig" or "weave." **Davis Dep, R. 49-4**, PageID# 1569, 1570. In spite of that, G.D. was not disciplined because Eugster, who testified that he was oblivious to the racial connotation, chalked it up to "girl drama," though he could not point to why he made this conclusion aside from noting that middle school girls "tend to be petty." **Eugster Dep, R. 49-5,** PageID# 1670. He could not recall if he asked G.D. whether she intended to follow through on the threat. **Id.** at PageID# 1673-1674.

On March 5, 2020, while watching a movie in class about careers, student D.S. leaned over to C.M. and, regarding two Black actors, said to her, "look, there are your parents." **C.M. Dep, R. 49-9**, PageID# 2327; **D.S. Docs, R. 51-20**, PageID# 3559.

---

[1] In September of 2021, Congress passed the CROWN Act, which states that "routinely, people of African descent are deprived of educational and employment opportunities" for wearing their hair in natural or protective hairstyles. See https://www.congress.gov/bill/117th-congress/house-bill/2116/text.

He added, "they can't have good jobs because they are black" and "niggers can't get jobs." **R. 49-9**, PageID# 2327. C.M, in tears, told her teacher and that she was "so upset she didn't know what to do" and was "used to" being subjected to this kind of racial treatment. **Id**. at PageID# 3551, 3554; **Davis Dep, R. 49-4**, PageID# 1561. D.S. received a one-day suspension for "disorderly conduct." **R. 51-20**. He was not disciplined for violating the discrimination policy nor was the "HIB" box checked. **Id.**

Rob contacted the school about D.S., stating, it "absolutely hurts my heart that she has to endure this kind of racism" and "I'm done with the racism at this school." **Id.** at PageID# 3553. The school did not increase its discipline, and nothing changed. D.S. went on to make derogatory racial comments in front of C.M. and "loud enough for the teacher to hear" about the "holocaust," "slurs," and "Black people". **C.M. Dep, R. 49-9**, PageID# 2328. There is no record of discipline for this behavior.

On September 4, 2019, student S.D. pulled C.M.'s hair, called her a "nigger", pulled her hair again, shoved her, and ripped her shirt. **S.D. Docs, R.52-2**, PageID# 3634, 3635, 3638; **Davis Dep, R. 49-4**, PageID# 1498-1501. This was captured on video. **Id.** Use of the n-word is documented in the District's file and was written down by the assistant principal on C.M.'s student statement form. **Id.** at PageID#3638, 3641.The school concluded the assault was racially motivated. **Wood's Notes, R. 50-8,** PageID#3114 ("6th grade...S.D...Eugster said fight racially driven") (cleaned up).

Yet in its findings on discipline the district ignored that the word "nigger" was used[2]. **S.D. Docs, R. 52-2**, PageID# 3634, 3635.

S.D. was given the lowest possible suspension, one-day. **Id.** Defendants admit S.D. was not disciplined at all for calling C.M. the n-word. **Davis Dep, R. 49-4**, PageID# 1501. The "HIB" box was not checked on her suspension form. **S.D. Docs, R. 52-2,** PageID# 3634. On September 8, 2019, Rob wrote to the school, encouraging them to increase disciplinary consequences and stating, "I'm not sure my daughter is sufficiently safe or protected at school[.]" **Id**. at PageID# 3649; **Davis Dep, R. 49-4**, PageID# 1525. Middle School Principal Bethany Davis agreed that Rob's concern was "fair." **Id.** There was no follow-up or action taken. **Id.**

The day after the assault, the Malicks requested a meeting with Eugster to discuss their concern about S.D. **S.D. Docs, R. 52-2,** PageID# 3642. They reported that S.D.'s behavior "continued" after she was disciplined and that she had said she was going to "fuck the bitch up," referring to C.M. **Id.** The school did not investigate, and S.D. was not disciplined for the second threat. **Davis Dep, R. 49-4**, PageID# 1517-1522.

On March 9, 2020, the Malicks called a meeting with Dan Gilbertson, Ryan Eugster, and Bethany Davis. **Meeting Notes, R. 49-26**. C.M. was present. They reported student A.W., who "keeps talking about [C.M.'s] hair" and was going to "dare" another student to "pull [C.M.'s] hair out." **Id.** The school did not investigate and A.W.

---

[2] In addition, the district court completely adopts Defendants' version of the facts and blames C.M. for instigating the interaction, which is not what occurred. Id.

was not disciplined. The Malicks reported that C.M. was becoming "numb to the racism" and that "teachers were not doing anything" to stop it. **Id.; Davis Dep, R. 49-4**, PageID# 1577-1578. C.M. reported that she felt she had to "look white." **Meeting Notes, R. 49-26.** Her parents stated she had "lost her spark" because of the racism at school. **Id.** The Malicks reported that the n-word was regularly said in the hallways. **Id.**

Following the meeting, the school did not implement measures to monitor and/or put an end to the use of the n-word in the hallways, or other racial bullying. **Davis Dep, R. 49-4**, PageID# 1582. The conduct—including use of the n-word and telling Black students to "pick cotton"— continued. **Student Affidavits, R. 49-13, 49-15, 49-16, and 49-17**; **Gilbertson Dep, R. 49-6**, PageID# 1823; **J.G. Docs, R. 51-23**; **M.S. Docs, R. 51-24**; **D.P. Docs, R. 51-19**; **A.J. Docs, R. 51-16**. It was reported to the school. Students continued to receive, at most, a three-day suspension for their behavior. **Appendix A.**

Because of racial bullying, Rob told the school that C.M. would not be returning for 8th grade. **10/6/2020 Email, R. 53-3** (C.M. "absolutely got owned last year in regards to racial bullying and abuse."); **Gilbertson Dep, R. 49-6**, PageID# 1824. **April Malick Dep, R. 49-8**, PageID# 2174 ("we couldn't send her back"). She was homeschooled.

Gilbertson and Wood knew that Plaintiffs decided to homeschool C.M. due to racial bullying. **Id**.; **Gilbertson Dep, R. 49-6,** PageID# 1825; **Wood Dep, R. 49-12**, PageID# 2745. Yet the school made no effort to investigate what occurred or required

23

training for staff and students. This is a significant part of Plaintiffs' deliberate indifference argument and one the district court did not give the appropriate weight to, again, accepting Defendant's version of the facts, as set forth below.

On June 11, 2021, student A.G. walked into the middle school wearing a full-size confederate flag as a cape. **A.G. Docs, R. 51-1, PageID#3285- 3286**. C.M., who was out of the building because of this very conduct, still saw the photo posted on another student's social media account. **C.M. Dep, R. 49-9**, PageID# 2333. Prior to this incident, A.G. had bullied C.M. based on her race; she regularly used the n-word to and about C.M. and other students of color. **Id.**

Rob wrote to Gilbertson, "people asked me why we chose to homeschool our daughter, [C.M.], this year. When kids are allowed to walk in with confederate flags, this is the biggest reason of them all. Just unbelievable[.]" **R. 51-1**. Gilbertson agreed that wearing that flag was "racially intimidating" to a Black student and a violation of the discrimination policy. **Gilbertson Dep, R. 49-6**, PageID# 1849. Yet he was satisfied that no discipline was taken against AG. **Id.** at PageID# 1853. She was merely asked verbally to remove the flag. **Id**. No record was made of her conduct. **Id.**

Contrary to Defendants' claim, the situation with A.G. was not "remedied." As set forth below, A.G. continued to display the confederate flag at school and was one of the worst offenders of racial bullying of C.M. **Davis Dep, R. 49-4**, PageID# 1608.

24

### ii.    Racial harassment of C.M. in High School

C.M. and her family decided that she would return in person to Croslex in the fall for ninth grade. **C.M. Dep, R. 49-9**, PageID# 2335. C.M. was hopeful that her peers had matured since middle school. **Id.** In August of 2021, before the start of school, the Malicks approached Melody Mills, the school's guidance counselor. **Mills Dep, R. 49-11**, PageID# 2598, 2652. They shared the racial bullying C.M. experienced in middle school and asked her for her help. **Id.** at PageID# 2366-2368. The Malicks requested that Mills, who oversaw schedule changes, adjust C.M.'s schedule so she did not have to take classes with problematic students. **Id.** at PageID# 2368. They reported specific student names, including A.G. **Id.** at PageID# 2362, 2364-2365, 2368. Mills took no notes on the conversation. **Id.** at PageID# 2367-2368. She "did not remember" what steps she took to help C.M, beyond "listening." **Id**. at PageID# 2355.

Contrary to Defendants' assertions, Mills did not change C.M.'s schedule to preclude her from having classes with A.G. The two were placed in classes together. **Id.** at PageID# 2356-2357. Mills claimed she "tried" to change C.M.'s schedule but when it was unsuccessful, she took no other steps to try to protect C.M, like alerting C.M.'s teacher to keep their eye on A.G. or talk to A.G. herself. **Id.** A.G. went on to racially bully and harass C.M.

The Malicks also requested a meeting with the high school principal, Kyle Wood, before the start of ninth grade. **April Malick Dep, R. 49-8**, PageID# 2156-2157;

**Wood Dep, R. 49-12**, PageID# 2740-2741. They shared what C.M. had experienced in middle school and asked him to put a stop to any racial bullying at the high school. **Id.** The Malicks wrote down a list of "repeat offenders"—students who had regularly bullied C.M. because of her race— and gave the list to Wood. **Id.** Wood took no preventive measures, nor any action at all, to try to stop the harassment. As soon as C.M. started high school classes she was subjected to the same, and worse, racial harassment.

C.M. started ninth grade on August 31, 2021. By October 4, 2021, roughly one month into the school year, C.M. had already experienced eight instances of racial bullying, summarized below. Rob emailed Lisa Burns, Kyle Wood, and Dan Gilbertson requesting a meeting and stating they "had a huge series of incidents in the past week or so. I need a meeting or something because this is ridiculous. When a substitute teacher's son tells my daughter to go back to the planation and pick some cotton is the day I have lost my right mind...I truly believe we need a ZERO tolerance policy." **Ex. 22 of Def's MSJ, R. 31-1**, PageID# 746-748 (cleaned up). Rob also reported a teacher, Katrina Pilant, who "somehow misses inexcusable behavior...C.M. hates going to that class because it feels like a Klan rally." **Rob Malick Notes on Bullying, R. 50-4.** The next day, October 5, Rob met with Wood and Burns and gave them the below list of incidents and student names. **Id.** Some of the students were not investigated or disciplined; others were given light punishments:

- **G.S. told C.M. her "hair looks like shit" and "continually says nigger."** **Id.** There is no record of discipline. He continued to racially bully C.M. and was reported a second time by Rob, as set forth below. He later told another Black student, "Black history month is over, go back to the cotton field and pick cotton." **G.S. Docs, R. 51-8.**

- **A.S. told C.M. "to go back to the plantation and pick cotton."** A.S. was given a one day in school and a one day out of school suspension. **A.S. Docs, R. 51-4.** The "HIB" box was not checked. **Id.**

- **D.P. told C.M. "I bet your hair is dead."** D.P. was suspended for one day **D.P. Docs, R. 51-7.** The "HIB" box was not checked. **Id.**

- **H.P. said to C.M. "I'm gonna snatch your weave and burn it."** There were two witnesses. H.P. was suspended for one day. **H.P. Docs, 51-9.** The "HIB" box was not checked. **Id.**

- **A.R. said to C.M. "I'm going to snatch your weave."** There is no record of discipline for this offense, contrary to the student handbook's section on "threats." **Id.**

- **J.S. "continually" makes racial comments; told C.M. he was going to "snatch her weave"; reported "ringleader" in fourth hour which Plaintiffs described to the school as a "Klan rally."** J.S. was suspended for one day. **J.S. Docs, 51-10.** The "HIB" box was not checked. **Id.**

- **A.M. said to C.M. he wants to "pull out her weave"; he is a "ringleader." Also raised his fists and kneeled to mock BLM while starring at C.M.** A.M. was suspended for one day. **A.M. Docs, R. 51-3.** The "HIB" box was not checked. **Id.**

None of these students were told they violated the school's discrimination policy.

**Wood Dep, R. 49-12**, PageID# 2850-2851.

On October 5, 2021 Rob wrote to two of C.M.'s teachers, including Pilant, stating C.M. has been "enduring a ton of racism in school so far this year. She hears it

27

in the hallways daily and sometimes hourly…we've been going down this road for three years now so I am reaching out to the teachers." **10/5/2021 Email from Robert Malick to Shelly O'vell, R. 50-2**. Rob also told one of the teachers that G.S. had been a problem in her class. **Id.** This was Rob's second time reporting G.S. There is no record that G.S. was talked to or disciplined.

On October 6, 2021 Rob wrote to the school that student M.R. was bullying C.M. because of her hair. **R. 50-5**. He stated that because of the racial bullying, C.M. had become "hypersensitive" he was "just so worried about her[.]" Id. The incident with M.R. was not investigated by the school and the student was not disciplined. **Id.**; **Wood Dep, R. 49-12**, PageID# 2859.

On October 8, 2021 the Malicks called a second meeting with Gilbertson and Wood. **10/8/2021 Meeting Notes, 50-7**. The Malicks told them that their daughter is a "victim of racism" at the school and students are not being punished with strict enough consequences. **Id.**; **10/8/2021 Gilbertson's Board Meeting Notes, R. 50-6**. They stated that "when punishment is issued, students are making jokes about it to their friends" and that students "are bragging" about "discipline being so light." **Id.**; **Wood Dep, R. 49-12**, PageID# 2868. Nevertheless, the school did not increase their disciplinary consequences and otherwise made no changes to the discipline students received. **Id.** at PageID# 2869-2870.

The Malicks also reported that a student in a "Civics" class social media chatroom stated, "Obama was a stupid nigger," and submitted evidence of this. **Ex. 25,**

**Def's MSJ, R. 31-4**, PageID# 787. C.M. had also seen the message. **C.M. Dep, R. 49-9**, PageID# 2360. The student received a five-day suspension on November 16, 2021— over one month later— for an "inappropriate comment on Snapchat." There was no mention of use of the n-word on his suspension form and the "HIB" box was not checked. **T.W. Docs, R. 51-13**.

The harassment continued. The Malicks called a third meeting on October 11 with Kyle Wood. C.M. was present. **10/11/2021 Meeting Notes, R. 50-8**. They reported "ongoing racism since sixth grade" which they believed was not "handled appropriately." **Id.** They reported that "eight to ten kids constantly use the "N" word." **Id**. They stated that the only way the bullying would stop is for the school to issue "stiffer" consequences, and the football locker room was "laughing" about light discipline. **Id.** They suggested a student assembly to address the conduct and that the school maintain a "zero tolerance policy" to address the bullying. **Id. Wood Dep, R. 49-12**, PageID# 2871. They stated they had already gone to the school board with these issues. **Id.** For a second time, they reported that C.M.'s fourth hour class period with Ms. Pilant feels like a "racism cult" and a "Klan rally" and reported student names. **Id.** Rob's calls for help were ignored.

The school did not speak to any of the students in Ms. Pilant's class. **Wood Dep, R. 49-12**, PageID# 2880. Gilbertson claimed there had been a "review" of the class but admitted there is no record of any such thing, and he has no results or findings. **Gilbertson Dep, R. 49-6**, PageID# 1893; **Wood Dep, R. 49-12**, PageID# 2755. It

would have been simple enough to interview the teacher and students, make a record, and administer directives on how to improve. None of this occurred.

During the same meeting, The Malicks reported the names of five students who constantly racially bullied C.M.: G.S., H.P., A.G., D.S., and D.P. **R. 50-8**. They listed several other examples of racial harassment, with student names, including reporting G.S. for a third time, for telling C.M. her "hair looked like a lion." **Id.** There is no record that G.S. was investigated or disciplined. The conduct continued after the meeting and the school did not change its discipline.

On October 20, 2021 Rob again requested a meeting with Gilbertson and Wood, the fourth that month. **R. 50-9; Wood Dep, R. 49-12**, PageID# 2905-2906. He intended to discuss "more incidents and comments with some of the same boys. I have everything documented and ready to go over." **Id.** He also told them that the Malicks were working with Kevin Watkins, the President and Chair of the Redress Committee of the Port Huron Branch of the NAACP. **Id.**

On October 26, 2021, the Malicks and Kevin Watkins met with Gilbertson, Wood, and the school's attorney, Joe Urban. **R. 50-21**, PageID#3217; **Appendix C,** pg. 11. Watkins put significant pressure on the school to adopt an anti-discrimination resolution. **Id**. at pg.12. C.M. told the group she "want[s] to feel safe at school" and that she was concerned about retaliatory bullying. **Id**. at pg.11. She said the school had failed to "send the message" to students regarding their conduct. **Id**. The Malicks reported the name of one student who called C.M. a "nark," in reference to her

reporting of race discrimination. **Id**. The Malicks reported six or seven different students, by name, who they were concerned about. **Id.** at pg.12.

On October 27, 2021, Rob emailed Gilbertson and Wood, reporting that D.P is still making "snarky comments about "oh that's racist". He is clearly mocking the situation," meaning C.M.'s reporting of discrimination. **10/26/21 Email from Rob**, **R. 31-7,** PageID#807. D.P. was not disciplined.[3] Rob also reported that C.M. is "nervous" as she is still sitting "right by" two students who had racially bullied her in the past. **Id.** Rob wrote that he has still had "grave concerns about Mrs. Pliant's classroom management and the safety of my daughter and other marginalized students." **Id**. Wood's response was focused not on Rob's concerns, but on the fact that C.M. had confronted a student who said the n-word. He also suggested that C.M. go virtual for Ms. Pilant's class, instead of removing the harassers. **Id**. Students in Ms. Pilant's class continued to, per Rob's later email to the school, "allow a culture of discrimination to flourish in her class." **11/16/2021 email, R. 50-15**.

On or around October 27, 2021, A.G. stated she was going to "fight" or "beat up" C.M. and was "going to get all the niggers" or "these niggers should watch their backs." **A.G. Docs, R. 51-1**, PageID# 3303, 3307, 3290; **Wood Dep, R. 49-12**,

---

[3] Student-on-student threats and harassment for participating in a race discrimination/ harassment investigation can provide the basis for Title VI liability when a school is deliberately indifferent to those threats, including threats made to or about family members. *S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 715 (6th Cir. 2023).

PageID# 2885-2887; **C.M. Dep, R. 49-9**, PageID# 2351-2352. C.M. learned of this and believed A.G., "was planning to kill me and a few other Black students" after school "at 3:00pm." **Id.; R. 51-1**, PageID#3310 ("[A.G.] was coming for [C.M.] after school today at 3:00pm."). Distraught, Rob immediately drove to the school. **R. 51-1**, PageID# 3293. He informed Gilbertson and Wood that he was filing a police report. **Id.** The next day he followed up with an email, telling Gilbertson and Wood that A.G. was still "glaring and leering" at C.M. in Ms. Pilant's fourth hour class he had "serious doubts as to the school's ability to protect my daughter." **Id.** at PageID# 3305.

A.G. received a one day out of school suspension and two days in school for "repeated threats to fight." **Id.** at PageID# 3287-3288. The school marked that there was "no victim" involved, a factor in assessing discipline. **Id.** The "HIB" box was not checked, and the suspension form made no mention of racial language. **Id.** Gilbertson testified, "Yeah, maybe they [administration] should have filled out the form to indicate" racial bullying, but he was not concerned about it. **Gilbertson Dep, R. 49-6**, PageID# 1890. In spite of the blatant racism by A.G., Gilbertson had no idea whether any school personnel ever talked to A.G. about the discrimination policy. **Id.** It is uncontested that she was never made to undergo training of any kind.

Wood—who did not believe A.G. had violated the school's discrimination policy— could not give a credible explanation as to why A.G. was not disciplined for using the n-word. **Wood Dep. R. 49-12**, PageID# 2884-2887; see also **A.G. Docs, R. 51-1,** PageID# 3307, 3290 (two witnesses to A.G. using the n-word in school, C.M. and

32

O.H.). Wood also accused C.M. of "escalating" this situation because C.M. had approached A.G. earlier that day asking her not to use the word "nigger" around her and other Black students in school when they were just "trying to learn." **Wood Dep, R. 49-12**, PageID# 2882-2883; **C.M. Dep, R. 49-9**, PageID# 2350, 2352.

Wood admitted that this was not A.G.'s first offense. **Wood Dep, R. 49-12**, PageID# 2884. A.G. had a history of racial harassment:

- As set forth above, A.G. wore the confederate flag as a cape into middle school. **R. 51-1.**

- A.G. admitted to the school (Lisa Burns) that she uses the word "nigger." **Id.** at PageID# 3316. Per Mills, the word was "a part of [A.G.'s] vocabulary." **Mills Dep, R. 49-11**, PageID# 2662.

- Another Black student, M.G., reported A.G. on October 19, 2021, for using the confederate flag as the profile photo of her school's Google account. M.G. noted that A.G. "has a history of racist statements and posts so this doesn't surprise me." **R. 51-1,** PageID# 3326.

- The same M.G. asked A.G. to stop using the word "nigger." She responded, "free speech, nigga." M.G. sent the conversation to C.M, who showed her parents. They reported it to the school. **Id.** at PageID# 3297-3298.

Wood did not view this conduct as racist, including use of the n-word and the confederate flag. **Wood Dep. R. 49-12,** PageID# 2886-2887. There is no record that A.G. was disciplined for any of these incidents.

On October 29, 2021, the students wore costumes for Halloween and C.M. dressed as a blue M&M candy. W.H. told C.M. "M&Ms are supposed to be white" and M.R. repeated the joke. Rob reported it to Wood, Gilbertson, and Mills. **Rob Malick**

**Email, R. 50-12**. Rob stated "she [C.M.] is starting to think about defending herself with the incessant bullying…" **Id.** The Malicks met with Gilbertson, Wood, Mills, and Burns that same day to discuss the incident and a few other concerns. **10/29/2021 Meeting Notes, R. 50-10**. There is no record that M.R. was investigated or disciplined; W.H. was given a one-day suspension.

Later that day, D.S. and W.H. stated they were going to "get [C.M.] back" for reporting W.H., and that C.M. "is taking it too far" and "can't take a joke." **10/29/2021 Reports of Students Retaliating against C.M., R. 50-11**. Rob reported it to Gilbertson and Wood. **Id.** ("This is getting ridiculous. Can you please handle this?"). There is no record of student discipline.

On November 1, the Malicks called a meeting with Gilbertson, Wood, and Burns that they described as "throwing a Hail Mary". **Rob Malick Dep, R. 49-10**, PageID# 2579. Rob told Wood that the school could not keep C.M. safe. **Id.** at PageID# 2579-2580. The Malicks suggested that C.M. begin walking with aides for her protection. **Id.** The school obliged and had two hall monitors escort C.M. around the school on a rotating basis. **Id.**

The monitors were "woefully insufficient" in keeping C.M. safe and were "borderline abusive." **Rob Malick Dep, R. 49-10**, PageID# 2580. They told C.M. things like "shut up" and "don't do [that]." **Id.** It is uncontested the aides stated that C.M. "had it [the racial harassment] coming," that she was "no saint," that she was "pulling the race card" which is what "Blacks do," and C.M. "acts like she's from the

hood in Detroit." **Rob Malick Dep, R. 49-10**, PageID# 2524, 2581; **11/16/21 email from Rob, R. 50-15**; **Statement from Amber Ramos, R. 49-20**; **Email from Rob, R. 50-3**; **CLS reports of discrimination, R. 50-21**. The Malicks reported this to the school and asked that the aides be removed. **Rob Malick Dep, R. 49-10,** PageID# 2582; **Rob Malick Complaints, R. 50-3**. One of the aides, Laurie Holloway, was eventually terminated. **Rob Malick Dep, R. 49-10,** PageID# 2526. The other, Laura Swoffer, is still employed and works as a teacher. **Id.** at PageID# 2581; **R. 50-3**. The school never provided a replacement to monitor C.M.

Desperate for help, the Malicks filed a complaint with the Michigan Department of Civil Rights alleging a racially hostile environment at the school. **Gilbertson Dep, R.49-6**, PageID# 1837. Gilbertson, who had already retained current defense counsel as to this matter, refused to do an internal investigation, testifying "that was the MDCR's responsibility." **Id.** at PageID# 1844.

Kevin Watkins of the NAACP offered to make a presentation at the Board of Education Meeting on November 15, 2021. The Board meeting can be viewed here: https://www.youtube.com/watch?v=5a4frmwvpss (beginning at the 30-minute mark); **Transcript of Board Meeting, R. 50-14.**

Watkins addressed the Board. He told them, "…there is racism here at Cros Lex…" and the anti-discrimination policy that they had in effect was "just on paper." He said, "Where are the teachers? Where are the administrators? I can't believe this has been going on… I'm speaking to these Board members. What you need, you need

sensitivity training starting in middle school. You need diversity, equity, inclusion training. And even the Board of Education [needs training] because you make the policies. You make the policy; you wrote that policy for antidiscrimination and allowed [this conduct to occur]. I can't believe you don't know what's going on. That's not true. You know what's going on." (cleaned up). **Id.**

C.M. also spoke during the meeting. She shared some of her specific experiences and explained she has "had a really hard time here since middle school, but this year has truly been the worst[.]" **Id.** at PageID# 3150, pg. 5. She told the Board she has been told to "go back to the cotton field," that students want to "burn [my] weave," and "saying the n-word like it's a joke." **Id.** She stated, "I would love for the school district to adopt a stronger discrimination policy. I want my fellow classmates to be able to walk into school without being discriminated against because of…the color of their skin…[.] I just wish that the community and school could treat each other equally." Another Black student, M.G., spoke and shared racist behavior that she experienced or observed "every single day." **Id.** at PageID# 3150-3151, pgs. 5-6. She said, "just coming into American History today someone said…the swastika…my favorite symbol…and he and his friends laughed, saying that the Jews deserved everything they got." Id. (cleaned up). M.G. also described jokes about George Floyd, students "talking about [her] hair" and asking if she "even goes to Croslex" because she is Black. Id. She told the Board she has had "multiple problems with the same people, the same names, the same families." **Id.**

Another student said the "racism this year has truly surprised" her, that the "n-word is just tossed around…it's not seen as serious here…I've heard kids say it in the hallway and there's teachers there and they've done nothing." **Id**. at PageID#3151, pg. 8. She went on to describe other racial harassment that had happened to friends of hers.

April told the Board she had been begging for the school to do something to stop the harassment for "years." **Id.** at PageID# 3150, pg. 2. She reported, among other things, that her daughter was told her life should end because of the color of her skin. **Id.** at pg. 3.

Pressured to take some action, the School Board passed a resolution "reaffirming its commitment" to complying with its own policy and federal and states laws. **Ex. 35, Defs' MSJ, R. 34**, PageID#906. This was a formality and had no impact on racial bullying at the school, as Board of Education President Katie Gordon admitted that the Board needed to "take additional steps." **Gordon Dep, R. 49-7**, PageID# 2084. See also **Watkins Affidavit, R. 49-18**.

The very next day, November 19, 2021, Student S.S., who C.M. had had problems with in the past, stated "I hate all you Black bitches" to C.M. and at least one other Black student. He also threatened C.M. with a pair of scissors. **S.S. Docs, R. 51-12**; **Email to Officer Wurmlinger, R. 50-24**. He was given a five-day suspension— one of three five-day suspensions that the school issued out of the 70 reports of racial harassment during the relevant time period. See **Reports of Racial Harassment, Appendix A; R. 21**. He was disciplined for "disorderly conduct" and the "HIB" box

was not checked. **Dunsmore Email to Davis, R. 49-27.** Wood "did not view" the conduct to be a violation of the discrimination policy. **Wood Dep, R. 49-12**, PageID# 2957-2958.

On December 8, 2021, C.M. and Rob reported B.R. wearing a silk scarf around his head and "mocking Black culture." **B.R. Docs, R. 51-6**, PageID# 3385 ("this is what she deals with because the kids just won't learn."). C.M.'s grandfather also wrote to the school, saying that C.M. "can't even go to school and feel safe…When she comes to me crying and says Papa I wish I was white and that she is tired of turning kids in because nothing is changing what do I say, turn the other cheek. All this is getting old. You need to do your dam[n] job and STOP this NOW or quit!" **R. 51-6**, PageID# 3383.

Despite B.R. having a disciplinary history of similar conduct, per the school's suspension form, he was given a level "A" consequence (two days out of school).

Shortly before this incident, Student B.R. had made retaliatory harassing statements about C.M., which the Malicks reported to the administration, saying that C.M. was "overreacting" and "racism isn't a problem here." **B.R. Docs, R. 51-6**, PageID# 3389, 3392, 3395. Rob also reported that B.R. said "April and myself are "suing the school for all the money" and "we're not going to let that happen," remarking that it "sounds like a threat to me." **Id.** at PageID# 3389. This same student referred to C.M. as a "monkey," a "nigger," called a different Black student an "African ape," and continually used the n-word. **Id.** at PageID# 3389, 3395; **E.F. Affidavit, R.**

38

**49-15**. It was reported to the school. **Id.** There is no record of discipline for these offenses nor the retaliatory comments. See also **C.M. Dep, R. 49-9**, PageID# 2357.

Superintendent Gilbertson admitted the racial harassment never stopped. **Gilbertson Dep, R. 49-6**, PageID# 1913-1914. Students continued to receive the same low level, "category A" disciplinary consequences.. **Appendix A.**

Teachers agreed that the school was not doing enough to change the environment. On June 29, 2022, Jeff Dahl, a social studies teacher at the district for 28 years, told April, in the wake of the lawsuit being filed, "Please keep up the fight…it breaks my heart what our kids are enduring just to go to school while it could be different with so little effort from the people in charge." **Jeff Message to April, R. 53.**

## I.    The Board had a custom of failing to respond to the harassment

The School Board of Education had a practice of ignoring the continuing racial harassment at school which amounted to a "custom" such to establish municipal liability on Plaintiffs' equal protection claim, set forth more fully, infra, at pg. 66.

Board President Katie Gordon acknowledged she knew of the severity of the racial harassment at school and believed the school was "not moving fast enough" to address it but testified that the Board took no action. **Gordon Dep, R. 49-7**, PageID# 2084. This is direct evidence of deliberate indifference as it requires no inferences to draw the conclusion that the school knew its practices were not working but did not change course. Gordon testified that she was "regularly" made aware that racial bullying was occurring in the school in general, and to C.M, and knew that the Malick family

39

had made "many" reports of racial bullying. **Gordon Dep, R. 49-7**, PageID# 2022, 2047, 2048, 2078-2079. She knew that C.M. had been told to go back to the plantation and pick cotton, and that the confederate flag was being displayed at the school. Id. at PageID# 2050, 2063.

During the November 15 Board meeting, Gordon "learned students were being discriminated [against]" and agreed that the Malicks were reporting "significantly serious information" as to the racial bullying C.M. was experiencing. **Id**. at PageID# 2057. She recalled learning "how difficult it is for [C.M.] each day…because of her skin color." **Id**. at PageID# 2058. Gordon admitted that, following that meeting, the Board needed to do more than repass the same resolution it already had in place, but she did "not have a reason" as to why she took no further action. **Id.** at PageID# 2054-2055; 2082.

When C.M. left the school, Gordon "wondered" if it had to do with the incessant bullying based on race and was "concerned" that it might have, but "did not look into it." **Id**. at PageID# 2098 ("I wondered. I just didn't look into it."), PageID# 2099, 2102.

Despite its knowledge of what occurred in its District, the Board did not keep a record of the racial harassment and never discussed the problem in their meetings or took any proactive measures to support C.M. and other Black students. **Id.** at PageID# 2015-2016, 2044-2045, 2063, 2078-2079. The Board itself had no training on race discrimination or racial bullying and did not ensure that teachers or students had training. Id. at PageID#2114.

**J.      C.M. was forced out of the district because of the racial bullying**

In January of 2022, the Malicks made the decision to pull C.M. out of the district. C.M. "did not feel safe at school," "had endured severe mental stressors including a nervous breakdown" and was "on Prozac and an anti-anxiety medication…directly [due to] the stress that she had endured from Cros Lex." **2/11/2022 Email re C.M. Mental Health, R. 50-25.** She did not return for the second semester. Her last day of school was on or around January 14, 2022. **Wood Dep, R, 49-12**. PageID# 2960; see also **CLS 2021-2022 Calendar, Appendix B**.

The school does not dispute that the harassment continued until the day C.M. left (and thereafter as to other students of color). C.M. testified that no one from the school district had "taken any measures that seemed to make a difference… There was no change being made whatsoever." **C.M. Dep, R. 49-9**, PageID# 2402-2404.

C.M. explained how she felt because of what she had been through:

> "I [felt] aggressive, including towards my parents." (cleaned up). "I wouldn't let anyone come near me[.] I wouldn't trust anyone. I had like a wall up. I was very depressed [and] anxious… I was very suicidal. I didn't want to talk to people. I didn't want to go out with friends. I just wanted to be home[.]"

> "[A]t one point I didn't want to be black at all…I wanted to have straight hair and have normal hair, not curly hair. I wanted to not have braids. I wanted to have blonde hair. I didn't want to have dark eyes. I didn't want to have a bigger nose or a darker skin complexion. I wanted to be of a different color. I wanted to be white so bad [and it] just got to the point where I was really suicidal and I would have mental breakdowns when I got home." **Id.** at PageID# 2405-2406.

41

C.M.'s grades also suffered because of the mental distress and constant distraction. She missed hours of class time reporting conduct. **Id.**, PageID# 2379, 2405. She had a 2.6 GPA at the time she left the district**. Id. at** PageID# 2404. C.M. is currently enrolled in and attending Port Huron High School. Her grades have significantly improved since she has left Croswell Lexington.

## II.     Legal Standard

The Court reviews de novo a district court's grant of summary judgment. *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 444 (6th Cir. 2009), abrogated on other grounds by *Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960 (6th Cir. 2020).

## III.     Legal Argument

### A.     The district court failed to view the facts in the light most favorable to the plaintiff

On a motion for summary judgment, a district court must view the evidence and all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[A]ny findings of fact in relation to a motion for summary judgment are not truly findings of fact and are entitled to no deference" upon appellate review. *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.,* 33 F.4th 872, 878 (6th Cir. 2022) (quoting *Garter-Bare Co. v. Munsingwear, Inc.*, 650 F.2d 975, 983 (9th Cir. 1980) (Wallace, J., concurring)). Here, the district court largely accepted Defendants' version of the facts, made inferences in their favor, and omitted important evidence that a reasonable jury

could have found showed deliberate indifference. Plaintiffs argue this throughout the brief.

**B.    Title VI Deliberate Indifference[4]**

A school district receiving federal funds may be liable for student-on-student harassment under Title VI's deliberate indifference standard if: (1) the harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school" (a racially hostile environment), the district (2) had actual knowledge, (3) had "control over the harasser and the environment in which the harassment occurs," and (4) was deliberately indifferent. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). Title VI is parallel to Title IX and the two statues are analyzed together. *See, e.g.*, *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998).

The district court correctly found that C.M. met elements (1)-(3). R. 67, PageID#4226- 27. It erred by holding that a reasonable jury could not find the school was deliberately indifferent.

**i.    The school continued to give the same, ineffective, low-level suspensions when it knew its practices were not working**

---

[4] Notably, "The deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title [VI] cases." *Id.* at 852 (citing *Williams ex rel. Hart v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)).

In nearly every case discussing deliberate indifference regarding a school's *response* to reports of harassment, abuse, or discrimination, the Sixth Circuit's focus has been on whether the school "could have or should have done [things] differently in order to bring the ... harassment to a *stop.*" *K.C. by & through T.C. v. Bd. of Educ. of Marshall Cnty. Sch., Benton, Kentucky*, 306 F. Supp. 3d 970, 982 (W.D. Ky. 2018), *aff'd sub nom. K.C. by & through T.C. v. Warner Marshall Cnty. Bd. of Educ.*, 762 F. App'x 226 (6th Cir. 2019) (emphasis in original). A school that takes some action, including issuing suspensions, is still "deliberately indifferent" when it has "actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail[.]" *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000); *See S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 714 (6th Cir. Nov. 15, 2023) (school was deliberately indifferent to "widespread harassment" even though it "swiftly issu[ed] three-day suspensions").

In *Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655, at 669 (2d Cir. 2012), the school argued it was not deliberately indifferent because it suspended the students involved, typically for five days, moved one offending student to another school, and implemented separate one-day "bullying and harassment prevention programs" for faculty and staff, students, and parents, among other things. *Id.* at 559-662.

The court found that the school was deliberately indifferent, noting, "in some circumstances, prompt disciplinary action against a student's identifiable harassers may show that a school district was not deliberately indifferent," but here, once the school

knew that their responses were insufficient, its response needed to "evolve." *Id.* 669. The court concluded that the response did not sufficiently evolve, but it should have, because the school knew that "disciplining [the plaintiff's] harassers—through suspensions or otherwise—did not deter others from engaging [the plaintiff] in serious and offensive racial conduct"; harassment of the plaintiff "grew increasingly severe" throughout his time at school; "disciplinary action had little effect, if any, on the taunting and other hallway harassment, which persisted until [the plaintiff] left" and the "district knew that the harassment predominantly targeted [the plaintiff's] race and color." *Id. See also Brooks v. Skinner*, 139 F. Supp. 3d 869, 889 (S.D. Ohio 2015) ("The number of incidents of harassment, together with the proven ineffectiveness of RULH's disciplinary measures in changing the culture of harassment, raise a genuine issue of material fact for a jury to decide whether a greater response was required on the part of RULH to address the racial harassment."); *Martin v. Swartz Creek Cmty. Sch.*, 419 F. Supp. 2d 967, 974–75 (E.D. Mich. 2006) ("The admitted fact that Plaintiff continued to make complaints of harassment every single month, and that the school district's efforts to discuss these events or otherwise punish individual student harassers did not abate the frequency or severity of such incidents, might alone create a jury question of whether the school was deliberately indifferent…When coupled with Plaintiff's many allegations of behavior that was witnessed by Defendant officials with no response, there is no question that Plaintiff has provided sufficient evidence of deliberate indifference. *Id.* (emphasis added)); *Doe v. Sch. Dist. No. 1, Denver, Colorado*,

970 F.3d 1300, 1314 (10th Cir. 2020) ("she alleges continual harassment despite her repeated reports to school authorities. Thus, the authorities knew that what they had been doing (if anything) had not sufficed. Failure of authorities to try something else can show deliberate indifference.").

Similarly, here, though Defendants issued discipline to some (but not all) of the offending students, they almost exclusively issued one-to-three-day suspensions, even when issuing larger suspensions for other conduct, i.e. vaping, as set forth above. The school did not change course upon learning that their methods were ineffective in stopping the harassment as to one student or overall.

On November 1, 2021, during a meeting with Gilbertson, Wood, and the school's attorney, Joe Urban, the school appeared to agree that it needed to increase suspension lengths. **11/1/2021 Meeting Notes**, **R. 50-13,** PageID#3137 (Urban stated that "second offenders will get 10 days."). This did not occur. See, generally, **Appendix A** (not a single 10-day suspension issued for racial harassment, including for repeat offenders).

Notably, the case law does not hold that a particular remedy or level of discipline is good enough on its face—only that, if the school knows their "measures" are not working, it must do something *differently* to remain in compliance with Title VI. Hence, it is no defense here that Defendants investigated and issued suspensions. The school had other options available to it, including going above a 3-day suspension, requiring student training on race discrimination, holding a school assembly on racial harassment,

giving directives to students as to using the n-word, creating a rule prohibiting use of the confederate flag, adopting training at a reduced or no cost, as was offered to them, etc. And though a plaintiff is not entitled to certain remedial measures, these options ought to be considered against what the school continued to do, year after year, which did nothing to end the racially harassing environment.

The district court also made an impermissible—and incorrect—finding of a material fact when it found that the school district employed a "noticeable escalation" in response to the racial harassment. **R. 67**, PageID# 4232-4233. The evidence is to the contrary. The district court plucked out two examples where two students were given five-day suspensions on November 19, 2021, and November 23, 2021. **Id**.; See **Appendix A**. These five-day suspensions were two of three times, total, over the course of four years, that the school gave above a three-day suspension. **Id.** The school then promptly went back to issuing one-to-three-day suspensions for conduct. **Id.** This is hardly a "noticeable" escalation, nor did it stop the harassment, contrary to the district court's findings. **R. 67**, PageID# 4232-4233. There were an additional 20 reports of harassment after the five-day suspension for that school year alone. **Id.** Five of those incidents took place when C.M. was still enrolled, including one that she reported. Id.

In addition, whether the school's efforts were too little too late is a question of fact for the jury. *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 446–47 (6th Cir. 2009), abrogated on other grounds by *Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960 (6th Cir. 2020) (whether the school's belatedly stepped-up efforts were 'too little, too

47

late' is a question for the jury."); *Theno v. Tonganoxie Unified Sch. Dist. No. 464,* 377 F.Supp.2d 952, 966 (D.Kan.2005).

The district court faults Plaintiffs for arguing the school should have issued "immediate expulsion" for harassing conduct. **R. 67**, PageID# 4234. That is not at all what Plaintiffs argue or suggest, as set forth above. There are many alternative options between what the school did here and immediate expulsion. But the school almost never went above a three-day suspension—nor did it implement any meaningful educational or non-disciplinary remedial measures, as set forth immediately below.

### ii.    Defendant's half-hearted non-disciplinary remedial measures changed nothing

Setting aside disciplinary measures, Defendants did not simply try *something else*— including providing meaningful educational opportunities for students and teachers — when their usual methods failed, as they must under Sixth Circuit law. In *Vance v. Spencer Cnty,* a Title IX case, the school gave a presentation to students on accepting people, implemented a new sexual harassment policy which provided a process for lodging a complaint with the school, and provided sexual harassment presentations and training for students and all employees. In spite of this, the Court found the school was deliberately indifferent because the "[the school's] response, although ineffective, remained exactly the same." *Vance v. Spencer Cnty. Pub. Sch. Dist.,* 231 F.3d 253, 261 (6th Cir. 2000) (internal citations omitted). The district court ignored this fact, but it is evidence of deliberate indifference.

The district court appeared to give credit to the school for several measures it categorized as a "response to racial issues." **R. 67**, PageID.4222. As set forth in detail above, the record shows this "response" did not address racial harassment at all. A jury is entitled to consider the school's lack of non-disciplinary measures in the deliberate indifference analysis. *See Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655, 668–71 (2d Cir. 2012) ("the jury could have reasonably found that the district's additional remedial actions were little more than half-hearted measures" where its "additional programs" focused on "bullying" … "but did not focus on "racial discrimination". Even if the training did touch on racism, a jury may consider that "its treatment of race and discrimination was tangential at best. *Id.* at 661). A jury is also entitled to compare the alternative training offered by the NAACP and the Malicks, both at reduced and no cost, respectively (both rejected by Defendants) when it evaluated the adequacy of the District's ultimate response to harassment. *See Id. at 670.*

The district court accepted as an undisputed fact that the school "implemented two new training programs for district staff" on racial harassment. **R. 67,** PageID# 4222. This is a disputed fact, as set forth above. Nor did the court consider the statements from the teachers, including the affidavit, which casts significant doubt on the quality and extent of the teacher training. **Coronado's Affidavit, R. 49-19.** Viewing the facts in the light most favorable to Plaintiffs, the record shows that the teachers were given very little, if any, required training on how to manage racial bullying.

### iii.    The school's "widespread" problem of racial harassment was a "known circumstance" that the district court ignored

The district court found that there was a widespread pattern of student-on-student racial harassment at the school such that "pervasiveness" was met— but then ruled, on incorrect legal grounds, that C.M. could not use that same uncontested evidence to establish "deliberate indifference." **R. 67**, PageID# 4227, 4232. The district court stated:

> "The harassment persisted throughout the time that C.M. attended middle school and high school in person between 2019 and 2021, the specific incidents reported by the plaintiffs **occurred in the context of other incidents of racial abuse that occurred throughout the school with regularity**, and the harassment ultimately had such a serious effect on C.M. that it caused her after 2021 to withdraw from public school and be home schooled. It even included conduct by some teachers. The testimony about generalized harassment that occurred on a "daily basis," not associated with specific incident reports or particular harassers, may be considered for the purpose of determining the level of severity and pervasiveness, **since C.M. and the school administration were aware of the culture of racism at the school, which had an effect on C.M.'s state of mind.**

**Id**. at PageID# 4227 (emphasis added). But on the very next page, the court went on to incorrectly conclude that "the deliberate indifference formulation individualizes the harassment as being directed to the same victim; a Title VI claimant "'cannot . . . premise the [further harassment] element of her . . . claim on conduct [by the perpetrator] directed at third parties.'" *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 621-22 (6th Cir. 2019) (quoting *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012)). **R. 67**, PageID# 4232, 4235 (holding a plaintiff must show that "the further actionable harassment would not have happened but for the objective

unreasonableness (deliberate indifference) of the school's response). This is incorrect as a matter of law.

As an initial matter, in *S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 715 (6th Cir. Nov. 15, 2023), the Sixth Circuit rejected *Kollaritsch*'s requirement that a K-12 student establish the "further harassment" element of her claim of deliberate indifference. The Court found that just one incident of sexual harassment, if the school had knowledge of other, similar incidents directed at other students, could establish deliberate indifference. *Kollaritsch* was a case at the University level. The *Metro Gov't* Court explained the important difference, that a "high school's elevated disciplinary authority, supervision, and control over students is distinct from the university context." *Id.* at 713. Hence, the district court was incorrect to conclude C.M. had to set forth any evidence of "further harassment," let alone harassment directed only to her instead of other students.

Per *Metro Gov't*, the district court should have considered the school's responses to similar harassment of other students— even if not directed at C.M.— because the school's response or lack thereof allowed the widespread conduct to continue and made the plaintiff more liable or vulnerable to it. The *Metro Gov't* Court stated that S.C.'s experience "was not the first of its kind. [The school] faced a widespread problem[5] of

---

[5] In *Metro Gov't*, there were reports of over one thousand instances of sexual misconduct at MNPS schools during one school year alone, with nearly 2,500 instances from 2012 to 2016. *Metro. Gov't*, 86 F.4th at 715 (6th Cir. 2023). To be clear, there were "80,000"

students circulating sexual pictures and videos of themselves and their peers in MNPS schools." *Id.* at 712. The Court went on to find that a "reasonable jury could find that [S.C.'s] unwelcome sexual contact was a result of [the school's] indifference to the problem of pervasive sexual misconduct in the schools…Title IX liability [lies] when a school is deliberately indifferent to a widespread pattern of sexual harassment"— even when it is not directed to the plaintiff herself. *Id.* at 715 (cleaned up). "There is no basis for excluding from the "known circumstances" a school district's knowledge that a problem is widespread and recurring throughout its student population." *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 449 (6th Cir. 2009) (abrogated on other grounds)

*Brooks v. Skinner*, 139 F. Supp. 3d 869, 884 (S.D. Ohio 2015) articulated the very error the district court made here when it framed the issue around whether the Defendants' response to each discrete reported incident of harassment, standing alone, was reasonable. The *Brooks v. Skinner* court found that that "framing of plaintiffs' claims is contrary to law", in pertinent part because, in analyzing Title IX (and Title VI) claims, "courts often turn to the substantial body of case law developed under Title VII for

---

some students across all 161 MNPS schools at the time. **Appendix D**, Excerpt from Appellant Brief; see also https://www.nashville.gov/departments/schools. This equates to a higher percentage of reports compared to the study body at Croswell Lexington, which had a 3.7% of reports, and Metro Gov't had 3.1%. The problem can no doubt be considered just as "widespread" in this case. It is also notable that roughly 50% of the student body in Metro Gov't was female and a potential target; here, there was only a handful of Black students.

assistance in interpreting discrimination claims in the educational context", citing to *Arceneaux v. Vanderbilt Univ.*, 25 Fed.Appx. 345, 347 (6th Cir.2001). *Id.* Thus, "in analyzing a hostile environment claim, courts have adopted a 'totality of the circumstances' approach that rejects disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment... The Sixth Circuit has held that the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Id.*

The district court improperly relied upon *Pahssen,* 668 F.3d 356. The facts in *Pahssen* were much different than this case. There, one student was sexually harassed by another student a total of three times. The harasser was expelled upon the third incident. *Id.* The plaintiff attempted to introduce evidence of later assaults against other female students, which occurred off of school property, to show the harassment was "pervasive." But there was no evidence the plaintiff herself had any knowledge of those assaults when they occurred such to impact her mental state. In addition, the third-party harassment occurred after the assault of plaintiff. Under those facts, the harassment of the third parties was unpersuasive evidence. But *Pahssen* also acknowledged such evidence may be relevant if a plaintiff can show how "incidents involving third-party victims…deprived her of access to the educational opportunities or benefits provided by the school," just as Plaintiffs have done so here. *Id.* at 363.

The district court also incorrectly suggested that Plaintiffs cannot hold the school accountable for harassment unless they can point to a specific complaint about a named individual harasser. The district court's point is not grounded in controlling law nor is it applicable to the facts here.

First, this is not a case where the plaintiff complained of one or two incidents that were never brought to the attention of school officials. To the contrary- in addition to the severe environment described above, the relevant school officials were aware of 83 reports of race discrimination between 2019- 2022 alone, per their own records. **CLS Reports of Discrimination, R. 50-21**. *C.f. Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 291 (1998) (notice of inappropriate comments by a teacher during class was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student"). *Crandell v. New York Coll. of Osteopathic Med.,* 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000), citing *Gebser,* articulated this principle:

> Clearly, the institution must have actual knowledge of at least some incidents of harassment in order for liability to attach, as this is the thrust of *Gebser.* It is equally evident, however, that actual knowledge of every incident could not possibly be required, as this would burden the plaintiff unfairly in cases of frequent harassment to report many separate incidents to the appropriate authorities and would oblige the court to determine whether each incident alleged was reported and therefore is actionable. Suffice it to say, in light of *Gebser,* that the institution at minimum must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based.

Plaintiffs have satisfied the notice requirement here. The record clearly establishes that the relevant school officials "had knowledge" of the generally racially

hostile environment that thrived at Croswell Lexington. Indeed, the district court states as much. **R. 67**, PageID#4227; 4211 ("the school administration were aware of the culture of racism at the school, which had an effect on C.M.'s state of mind" and "over the years that C.M. was a student in the district's schools, the ugly specter of racism recurred").

Next, as to law, the district court cites to the dissent in *Patterson* in support of its finding that generalized harassment cannot be actionable in the deliberate indifference analysis. See **R. 67**, PageID# 4232. This is not controlling law. The majority held that a school district may not escape liability by arguing that it "dealt successfully with each identified perpetrator" where the plaintiff continued to suffer under a widespread pattern of harassment at the hands of many different students, "a fact of which Hudson was fully aware." *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 449 (6th Cir. 2009), abrogated on other grounds by *Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960 (6th Cir. 2020). Similarly, in *Vance*, which involved widespread student on student harassment, the Court found it was "undisputed" that the district had actual knowledge where plaintiffs made "repeated" reports to teachers and principals. 231 F.3d 253, 259. The Court did not parse each and every complaint to ensure it was reported to a school official because based on the totality of the evidence, the record established that the school was aware of the problem. Here, too, it is undisputed that the school district was on notice of the extent of the harassment happening to and around C.M.

### iv. The district court ignored clear evidence of deliberate indifference

Plaintiffs set forth clear evidence that the school knew its practices were not working—yet they did not change course. The district court ignored this evidence. Perhaps the most obvious indication to the school that its remedial measures were not working was when students were so emboldened that they began "bragging" and "joking" about the light suspensions given for racial harassment, as set forth above, compared to, for example, first time vaping offenses. **See also 49-15, PageID#2995.** (student B.R., who had a record of racial harassment, stated that the "school was not going to do anything about C.M.'s complaints."). This was reported to the school administration. Board President Katie Gordon admitted that this kind of bragging and joking should have been a sign that the school needed to "ramp up" its punishment. **Gordon Dep, R. 49-7**, PageID# 2104. Yet they did not increase disciplinary consequences, implement non-disciplinary educational opportunities— or try anything new in response.

This kind of direct evidence of deliberate indifference is unique to this case. When the offending students began openly scoffing at one-to-three-day suspensions, the message was clear: the school's practices were not being taken seriously—indeed, they were being laughed at. The district court erred by completely omitting this fact instead of finding that a reasonable jury could conclude that this was evidence of deliberate indifference.

A second unique fact ignored by the district court bears heavily on deliberate indifference in this case. Here, Plaintiffs told the school C.M. was being deprived of an education because of the racially hostile environment when she opted to be homeschooled for the entirety of her 8th grade year. Plaintiff C.M. returned for ninth grade, thereby providing the school with notice and an opportunity to change course in light of the "known circumstance" that one of its students retreated from the building to avoid being harassed. Though it is undisputed the school knew why C.M. left for 8th grade, Plaintiffs also met with Kyle Wood before C.M. started 9th grade to explain their sincere concerns, share names of student harassers, and ask for help. The school did not change its approach.

The district court spun the events quite differently—not applying the 'light most favorable' standard—by ignoring the above and instead finding that "no incidents were reported during the 2020-21 school year when the plaintiff was home schooled." **R. 67** at PageID# 4232. True enough—because C.M. could not countenance showing up to school every day and was out of the building, where, notably, the racial harassment continued as to other students. See **Appendix A**.

This does not absolve the school of liability. To the contrary, Title VI exists to prevent this very result, where a student is "excluded from participation in [or] denied the benefits of" being a student at the school. 42 U.S.C.A. § 2000d. That's especially clear in cases like this one where a "student is put in the position of choosing to forego an educational opportunity in order to avoid contact with the harasser[s], or to continue

attempting to receive the educational experience tainted with the fear of further harassment or abuse." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022); See also *Metro. Gov't*, 35 F.4th at 462; *Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 35 F.4th 459, 467 (6th Cir. 2022), cert. denied sub nom. *Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Doe*, 143 S. Ct. 574, 214 L. Ed. 2d 340 (2023) ("a reasonable jury could conclude that, rather than take steps to remedy the violation, MNPS opted to avoid the problem, resulting in [plaintiff] having no choice but homeschooling or enduring further misconduct.").

Ultimately, the school's deficient response left C.M. so vulnerable to further harassment that she had to withdraw from the school permanently and move to a district much further from her home.

### v. *Foster* and *Stiles* are not proper comparators

The district court discussed *Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960, 963 (6th Cir. 2020) in considerable depth to support its holding that Croswell Lexington was not deliberately indifferent. The case is inapposite. It involved one harasser and one target, the plaintiff, who were both 40-year-old MBA students taking courses at a hotel 2,000 miles away from campus. The two had a consensual relationship that continued even after the plaintiff made complaints against him. *Id.* at 962-963.

Once the plaintiff complained of the harasser's conduct, the University took every measure it conceivably could to ensure the two did not see each other, including

ordering the harasser not to contact the plaintiff, banning him from her hotel, requiring him to eat meals separately from her and his fellow classmates, instructing him to leave any social event she attended, and warned him against retaliating in any way. *Id.* at 963. The University assigned two administrators to monitor his activity and assist the plaintiff if any issues arose. *Id.* at 966. The University excused the plaintiff from taking courses, granted her time to complete her assignments, and allowed her to retake tests. *Id.* at 977. The University also coordinated with local police to conduct a "threat assessment" on the harasser and worked with the police to ensure he did not come near the plaintiff. *Id.* at 963.

The Sixth Circuit found that the "University did its level best to protect [the plaintiff] from this harassing classmate. It started with precautionary measures, moved to a verbal warning, and imposed a series of increasingly severe sanctions that led to a suspension from the last class and commencement as well as a one-way flight back to California. That wasn't the end of it. The University banned the harasser from its Ann Arbor campus for three years, permanently banned him from any campus events that Foster planned to attend, and placed a notation on his transcript that he had engaged in sexual harassment. All the while, it took proactive measures to protect [the plaintiffs' safety." *Id.* at 967 (6th Cir. 2020) The Sixth Circuit noted that "these measures indeed went beyond what a university is required to do" and found that the University was not deliberately indifferent. *Id.* at 967.

The Sixth Circuit noted important differences between universities and grade schools "when it comes to the control they have over students…that's all the more true for off-site graduate programs conducted at a hotel, over 2,000 miles from a campus, for mid-career executives with an average age of 40. Much of the misconduct in this case did not even occur in the classroom but in inappropriate comments on Facebook, over which the University has no control. All of this does not mean Title IX fails to protect forty-year-old "free adults" learning in an off-site graduate school; it just means the deliberate-indifference inquiry operates differently than it does for elementary-age "schoolchildren" over whom grade schools possess a unique degree of "supervision and control." *Id.* at 970 (6th Cir. 2020) (internal quotations omitted).

*Foster* differs significantly from the facts at issue here for the reasons set forth above, but put most simply, because of the racially hostile environment that was severe and pervasive C.M. faced day in and day out. The school, despite exercising a high degree of control over its students, rarely ever went above a three-day suspension and did not try any new measures despite knowing its conduct was not working. This is in stark contrast to *Foster*, where the University went above and beyond to try to stop the harassment. *Foster* is not a good comparator.

Nor is *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 851 (6th Cir. 2016) the proper comparator. There are many key differences. First, the school district in *Stiles* was not permeated with conduct that created an overall intimidating, hostile environment based on the plaintiff's protected characteristic. The bullying occurred to

one male student who did not "not report" the day-to-day "name calling and shoving," and there was no evidence that it occurred in front of teachers or staff. *Id.* at 841, 843.

Many of the plaintiff's complaints were not substantiated, even by the plaintiff himself. *Id.* at 841- 843, 844, 846. The nature of the harassment was also different in *Stiles.* There were a handful of incidents where the plaintiff was called a slur, but much of the conduct was plaintiff fighting with other male students, not in conjunction with overt gender or sex-based harassment. The Court also noted that the plaintiff "made straight As at [school] in both his seventh and eighth grade years, including in some advanced classes." *Id.* at 846.

## IV.    Equal Protection Claim

Plaintiffs establish an equal protection violation by showing that the school was deliberately indifferent to discriminatory peer harassment. *Stiles*, 819 F.3d at 851-52. "The deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title [VI] cases." *Id.* at 852 (citing *Williams ex rel. Hart v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)).

### A.    The municipality had a custom of deliberate indifference

A school district (here, through the Board of Education, Wood, and Gilbertson[6]) may be liable under § 1983 for a violation of the Equal Protection Clause if it had a custom or policy of deliberate indifference to student-on-student racial harassment. *Williams v. Port Huron Sch. Dist.,* 455 Fed. Appx. 612, 618 (6th Cir.2012). A "custom" that has not been officially adopted by the municipality but nevertheless is a practice "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Doe v. Claiborne Cnty.,* 103 F.3d 495, 508 (6th Cir.1996). *See also Pembaur v. City of Cincinnati,* 475 U.S. 469, 482 n. 10, 106 (1986) (observing that a municipality " 'may be sued for constitutional deprivations pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels' ") (quoting *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018).

"If the decision to ignore harassment and abuse of plaintiff "was made by the government's authorized decisionmakers the [Board] is responsible." *Schroeder ex rel. Schroeder v. Maumee Bd. of Educ.,* 296 F. Supp. 2d 869, 875–76 (N.D. Ohio 2003) (citing to *Meyers v City of Cincinnati,* 14 F.3d 1115, 1118 (6th Cir. 1994).

Here, as set forth, supra, at pg. 42, the School Board President knew of the pervasive harassment C.M. experienced yet failed to take "steps to stop [it], despite its awareness that such harassment was ongoing" …this "is not reasonable and can be said

---

[6] Local government officials sued in their official capacities are "persons" for purposes of § 1983 claims. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

to represent an official policy or custom of the School Board." *See Fulton v. W. Brown Loc. Sch. Dist. Bd. of Educ.*, No. 1:15-CV-53, 2015 WL 3867243, at *6 (S.D. Ohio June 23, 2015) (quoting *Vance*, 231 F.3d at 261 and *McCoy v. Board of Educ., Columbus City Sch.*, 515 Fed. Appx. 387, 391 (6th Cir.2013).

In addition, departure from bylaws can "evince a custom or policy of deliberate indifference to the need to address claims of racial and other forms of unlawful discrimination." *Fulton v. W. Brown Loc. Sch. Dist. Bd. of Educ.*, No. 1:15-CV-53, 2015 WL 3867243, at *6 (S.D. Ohio June 23, 2015); *See also Shively v. Green Loc. Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 357 (6th Cir. 2014) ("It is well settled law that departures from established practices", such as those set forth in a school's policies, "may evince discriminatory intent.").

Here, the Board had a "legal responsibility to uphold the bylaws and the board policies", which includes a discrimination policy that "prohibits discrimination by…students." **Gordon Dep, R. 49-7**, PageID#2088; **Board of Education Policies, R. 52-5**, PageID#3671. The Board utterly failed to take any action to remedy the racial bullying, as set forth above, in violation of their policy. The Board had designated Donna Barrier to serve as the School District's Compliance Officer including as to student-on-student race discrimination at the school. **Id.** The Board took no action to ensure Barrier was carrying out her duties— indeed, as set forth in detail above, she was not.

Gilbertson, Wood, and Board of Education made the choice to allow the racial harassment to continue, despite having been presented with a number of alternatives. This establishes municipal liability. *Pembaur,* 475 U.S. at 483 (Municipal liability attaches where a "deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible.").

Another way of imputing such responsibility "is to show a policy of inadequate training." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). Plaintiffs have established liability through the school's failure to train teachers and board members as to racial harassment and how to prevent and manage it in school. A school is liable under a "failure to train" claim "when it fails to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Ellis*, 455 F.3d at 700–01 (citing *City of Canton*, 489 U.S. at 390 n. 10; *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)). The consequences of the school's failure to train its teachers on proper intervention were not only "foreseeable," but they were occurring regularly at school in front of teachers and administrators. Here, the Board President had not seen, and did not know, what training was offered for teachers and students (besides CPR and "first aid"). **Gordon Dep**, R. 49-7, PageID.2086. Even after the November 15 meeting where Plaintiffs and others presented about race discrimination, the Board never asked that a single training on race be implemented for students or teachers. **Id**. It is uncontested that there was no mandatory training for students. On these facts, Plaintiffs have established liability as to the Equal Protection claim.

**B.    Wood and Gilbertson are not entitled to qualified immunity in their "personal" capacity**

To defeat a qualified immunity defense, Plaintiffs must show (1) Wood and Gilbertson's conduct violated a constitutional right and (2) the constitutional right was "clearly established" at the time of their conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

First, as set forth above, Wood and Gilbertson violated C.M.'s constitutional right when they were deliberately indifferent to C.M.'s allegations of student-on-student racial harassment. *Shively v. Green Loc. Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 358 (6th Cir. 2014). Wood and Gilbertson knew that the school's remedial measures were not working, and the bullying continued as to C.M. and others.

Defendants relied on *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 619–20 (6th Cir. 2012) below[7]. There, this Court found that the defendants took reasonable action in light of the known circumstances by attempting "several strategies" to try to stop the racial harassment and "solicited the assistance of others to formulate a strategy." *Id.* This included hiring a group of management consultants to conduct a study on the learning environment at the school and provide findings and

---

[7] In that case, the Sixth Circuit declined to consider plaintiffs' Title VI and state claims, stating the claims were not "inextricably intertwined", that the qualified immunity claim relied on a "smaller subset of facts" than the underlying Title VI claim, and that "Title VI liability may lie against the entity, regardless of whether this Court finds the individual actors liable under § 1983. Our determination has no bearing on the merits of Plaintiffs remaining claims. *Id.* at 621.

recommendations as to the racially charged atmosphere. At the suggestion of the consultant team, the school held three grade-level assemblies that addresses the conduct and offered anonymity and protection from retaliation for students who reported violators. The defendants also removed a racial slur from a locker, set up video surveillance in locations where harassment occurred, ordered students to remove depictions of Confederate flags from their vehicles and clothing, participated in a group dedicated to improving the situation at the school alongside other members of the community, expelled a student who created a racist poster, and held three grade-level assemblies to address the conduct. The Court found this not "clearly unreasonable in light of the known circumstances." *Williams*, 455 F. App'x at 619.

By contrast, here, neither Wood nor Gilbertson attempted several "strategies." They did not expel any students for racist behavior—they almost never went above a three-day suspension— held no student assemblies on racial bullying, hired no outside consultants to make findings as to racial bullying, required no training, and permitted students to display the confederate flag and openly use the n-word at school. **Appendix A.**

In addition, as set forth above, Wood did not believe much of the conduct was racially discriminatory. He never checked the "HIB" box on student suspension forms. Wood failed to implement any new measures as to racial harassment when April and Rob met with him before C.M. started ninth grade.

Gilbertson rejected the Plaintiffs' suggestions as to better training at a reduced cost. Kevin Watkins, who had discussions with both Wood and Gilbertson about racist conduct at the school, developed the opinion that they did not intend on stopping the problem of racial harassment at the school. **Watkins Affidavit, R. 49-18**.

Second, "the equal protection right to be free from student-on-student discrimination is well-established." *See Williams*, 455 Fed.Appx. at 619; *Murrell v. School District No. 1, Denver*, 186 F.3d 1238, 1250–52 (10th Cir. 1999); *Flores v. Morgan Hill Unified School Dist.,* 324 F.3d 1130, 1135 (9th Cir. 2003); *See also Doe v. Forest Hills Sch. Dist.,* No. 1:13-CV-428, 2015 WL 9906260, at *14 (W.D. Mich. Mar. 31, 2015) ("a prior case need not be directly on point" as long as "existing precedent placed the statutory or constitutional question beyond debate.") (cleaned up). Wood and Gilbertson were "objectively unreasonable" in failing to address their complaints of student-on-student harassment and are not entitled to qualified immunity on the equal protection claim. *Shively v. Green Loc. Sch. Dist. Bd. of Educ.,* 579 F. App'x 348, 358 (6th Cir. 2014); *Brooks v. Skinne*r, 139 F. Supp. 3d 869, 892 (S.D. Ohio 2015).

## V.    Plaintiffs Have Cognizable Non-Emotional Distress Damages

The district court correctly found that the Plaintiffs established compensable damages under *Cummings v. Premier Rehab Keller, PLLC,* 142 S. Ct. 1562 (2022). **R.67, PageID#4227**.

## VI.    Plaintiffs have established a direct liability claim under the Elliot Larsen Civil Rights Act

The ELCRA specifically prohibits race-based discrimination by educational institutions, stating a school shall not "[d]iscriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of ...race." MCL 37.2402(a). The Michigan Supreme Court recently addressed whether a peer harassment claim may be brought by a student under the ELCRA. *See Doe ex rel. Kolokithas v. Alpena Pub. Sch. Dist.*, No. 165441, 2024 WL 3573522, at *1 (Mich. July 29, 2024). It held that a school may not be vicariously liable under the ELCRA for student-on-student sexual harassment, but it remanded to the court of appeals to determine whether the plaintiff could establish a claim based on "a theory of direct (as opposed to vicarious) liability under the ELCRA." *Id.* at *6. Justice Cavanaugh expanded upon this holding in her concurrence, stating, "a direct non-agency theory of liability would require a focus on defendants' notice of [the] harassment, their responsive actions within the educational environment, and how defendant's actions impacted plaintiff." *Id.* at *7 (Cavanaugh, J., concurring).

Plaintiffs are not asking that this Court decide what standard a plaintiff must establish to hold a school directly liable for student-on-student harassment under the ELCRA. This is an active question before the Michigan Courts and is best determined by the state courts. *See Lehman Bros. v. Schein*, 416 U.S. 386, 390-91 (1974) (discussing how a federal court giving a state court the opportunity to answer a novel and unsettled

state law question "save[s] time, energy and resources and helps build a cooperative judicial federalism"). This Court need not determine that standard in order to resolve this appeal, as, at the very least, a school may be liable for its deliberate indifference under a theory of direct liability, even if the Michigan courts eventually determine a lower, less onerous standard is warranted. A jury could find Croswell-Lexington was deliberately indifference, as set forth above. If this Court disagrees that a jury could find Croswell-Lexington was deliberately indifferent, Plaintiffs ask the Court to reverse on the ELCRA claim with instructions for the district court to decline to exercise supplemental jurisdiction over the state law claim.

## V.    CONCLUSION AND RELIEF REQUESTED

For the reasons explained, the Court should reverse the judgment below and remand for further proceedings.

Dated: August 19, 2024                    Respectfully submitted,

**DEBORAH GORDON LAW**
*/s/ Deborah L. Gordon*
Deborah L. Gordon (P27058)
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, MI 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 17,889 words of Garamond 14-point proportional type. Plaintiffs-Appellants sought and were given relief by Order of the Court granting an extension in word limit for their principal brief [**Document 41**]. The word processing software used to prepare this brief was Microsoft Word 2016.

Dated: August 19, 2024                    Respectfully submitted,

                                          **DEBORAH GORDON LAW**
                                          */s/ Deborah L. Gordon*
                                          Deborah L. Gordon (P27058)
                                          33 Bloomfield Hills Parkway, Suite 220
                                          Bloomfield Hills, MI 48304
                                          (248) 258-2500
                                          dgordon@deborahgordonlaw.com
                                          *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

This certifies that Plaintiffs-Appellants' Corrected Brief was served on August 19, 2024, by electronic mail using the Sixth Circuit Court of Appeal's Electronic Case Filing system on all parties of record.

Dated: August 19, 2024                    Respectfully submitted,

                                          **DEBORAH GORDON LAW**
                                          */s/ Deborah L. Gordon*
                                          Deborah L. Gordon (P27058)
                                          33 Bloomfield Hills Parkway, Suite 220
                                          Bloomfield Hills, MI 48304
                                          (248) 258-2500
                                          dgordon@deborahgordonlaw.com
                                          *Attorneys for Plaintiffs-Appellants*

## DESIGNATION OF RECORD

| Record Entry No. | Date Filed | Description of Entry | Page ID Range |
|---|---|---|---|
| **1** | 5/23/2022 | Complaint and Jury Demand | 1 – 21 |
| **29-8** | 4/18/2023 | **Ex. P** – Docs from 9/4/2019 Incident re: Defendants' Motion for Summary Judgment | 399 – 417 |
| **31-1** | 4/18/2023 | **Ex. 22** – Rob Malick Email to Wood 10/4/2021 re: Defendants' Motion for Summary Judgment | 745 – 748 |
| **31-4** | 4/18/2023 | **Ex. 25** – Notes from 10/8/2021 Phone Conference re: Defendants' Motion for Summary Judgment | 780 – 791 |
| **32-2** | 4/18/2023 | **Ex. 33** – SAG Meeting Minutes 11/2/2021 re: Defendants' Motion for Summary Judgment | 897 – 900 |
| **34** | 4/18/2023 | **Ex. 35** – Board Meeting Minutes and Resolution 11/15/2021 re: Defendants' Motion for Summary Judgment | 903 – 907 |
| **36-7** | 4/18/2023 | **Ex. 44** – Training Record re: Defendants' Motion for Summary Judgment | 1062 – 1063 |
| **36-9** | 4/18/2023 | **Ex. 46** – Habitudes Program Docs re: Defendants' Motion for Summary Judgment | 1066 – 1087 |
| **49-2** | 5/26/2023 | **Ex. A** – Barrier Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 1212 – 1272 |
| **49-3** | 5/26/2023 | **Ex. B** – Burns Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 1273 – 1426 |
| **49-4** | 5/26/2023 | **Ex. C** – Davis Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 1427 – 1622 |

| 49-5 | 5/26/2023 | **Ex. D** – Eugster Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 1623 – 1764 |
|---|---|---|---|
| 49-6 | 5/26/2023 | **Ex. E** – Gilbertson Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 1765 – 1980 |
| 49-7 | 5/26/2023 | **Ex. F** – Gordon Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 1981 – 2128 |
| 49-8 | 5/26/2023 | **Ex. G** – April Malick Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 2129 – 2307 |
| 49-9 | 5/26/2023 | **Ex. H** – C.M. Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 2308 – 2440 |
| 49-10 | 5/26/2023 | **Ex. I** – Robert Malick Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 2441 – 2592 |
| 49-11 | 5/26/2023 | **Ex. J** – Mills Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 2593 – 2722 |
| 49-12 | 5/26/2023 | **Ex. K** – Wood Dep re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 2723 – 2982 |
| 49-13 | 5/26/2023 | **Ex. L** – Affidavit of C.M. re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 2983 – 2986 |
| 49-15 | 5/26/2023 | **Ex. N** – Affidavit of E.F. re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 2992 – 2996 |
| 49-16 | 5/26/2023 | **Ex. O** – Affidavit of J.B. re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 2997 – 3000 |
| 49-17 | 5/26/2023 | **Ex. P** – Affidavit of K.B. re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3001 – 3005 |

| 49-18 | 5/26/2023 | **Ex. Q** – Affidavit of Kevin Watkins re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3006 – 3010 |
|---|---|---|---|
| 49-19 | 5/26/2023 | **Ex. R** – Affidavit of Sara Coronado re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3011 – 3014 |
| 49-20 | 5/26/2023 | **Ex. S** – Statement from Amber Ramos re: Plaintiff' Response to Defendants' Motion for Summary Judgment | 3015 – 3017 |
| 49-21 | 5/26/2023 | **Ex. T** – Scott Coats Investigation Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3018 – 3049 |
| 49-22 | 5/26/2023 | **Ex. U** – Heather Shanks Messages to April Malick re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3050 – 3051 |
| 49-25 | 5/26/2023 | **Ex. X** – Defendants' Response to Plaintiffs' 1st RTP re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3061 – 3067 |
| 49-26 | 5/26/2023 | **Ex. Y** – 3/9/2020 Parents Meeting Notes re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3068 – 3070 |
| 49-27 | 5/26/2023 | **Ex. Z** – 3/6/2020 Jessica Dunsmore Email to Bethany Davis re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3071 – 3073 |
| 50 | 5/26/2023 | **Ex. AA** – CLS Specific Reports of Student Racial Harassment re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3074 – 3080 |
| 50-1 | 5/26/2023 | **Ex. BB** – 10/30/2020 Email from Student P.S. re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3081 – 3086 |
| 50-2 | 5/26/2023 | **Ex. CC** – 10/5/2021 Email from Robert Malick to Shelly O'Vell re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3087 – 3093 |

| 50-3 | 5/26/2023 | **Ex. DD** – 11/16/2021 Robert Malick's Email Complaints about Staff re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3094 – 3095 |
|---|---|---|---|
| 50-4 | 5/26/2023 | **Ex. EE** – Robert Malick's Notes on Bullying Incidents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3096 – 3101 |
| 50-5 | 5/26/2023 | **Ex. FF** – Robert Malick's Emails re: C.M. Comments re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3102 – 3103 |
| 50-6 | 5/26/2023 | **Ex. GG** – 10/8/2021 Dan Gilbertson's Board Notes re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3104 – 3108 |
| 50-7 | 5/26/2023 | **Ex. HH** – 10/8/2021 Meeting Notes re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3109 – 3110 |
| 50-8 | 5/26/2023 | **Ex. II** – Wood's 10/11/2021 Malick Meeting Notes re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3111 – 3119 |
| 50-9 | 5/26/2023 | **Ex. JJ** – 10/20/2021 Robert Malick Email Request for Meeting re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3120 – 3124 |
| 50-10 | 5/26/2023 | **Ex. KK** – 10/29/2021 Parents Meeting Notes re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3125 – 3130 |
| 50-11 | 5/26/2023 | **Ex. LL** – 10/29/2021 Reports of Students Retaliating Against C.M. re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3131 – 3133 |
| 50-12 | 5/26/2023 | **Ex. MM** – Robert Malick Email re: M&Ms being white re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3134 – 3135 |

| 50-14 | 5/26/2023 | **Ex. OO** – 11/15/2021 Board Meeting Transcript re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3148 – 3171 |
|---|---|---|---|
| **50-15** | 5/26/2023 | **Ex. PP** – 11/16/2021 Robert Malick re: Abusive Aides re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3172 – 3173 |
| **50-16** | 5/26/2023 | **Ex. QQ** – Enrollment Data re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3174 – 3175 |
| **50-19** | 5/26/2023 | **Ex. TT** – 11/18/2021 April Malick Email re Diversity Club re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3186 – 3187 |
| **50-20** | 5/26/2023 | **Ex. UU** – 6/8/2022 Email on Optional Diversity Training re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3188 – 3206 |
| **50-21** | 5/26/2023 | **Ex. VV** – CLS Reports of Discrimination re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3207 – 3262 |
| **50-22** | 5/26/2023 | **Ex. WW** – CLHS 11/17/2021 Kyle Wood and Lisa Burns Notes on J.P. Interview re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3263 – 3266 |
| **50-24** | 5/26/2023 | **Ex. YY** – 11/19/2021 Email to Officer Wurmlinger re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3270 – 3272 |
| **50-25** | 5/26/2023 | **Ex. ZZ** – 2/11/2022 Email re: C.M. Mental Health re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3273 – 3274 |
| **51** | 5/26/2023 | **Ex. AAA** – A.D. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3275 – 3283 |
| **51-1** | 5/26/2023 | **Ex. BBB** – A.G. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3284 – 3328 |

| 51-2 | 5/26/2023 | **Ex. CCC** – S.D. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3633 – 3650 |
|---|---|---|---|
| 51-3 | 5/26/2023 | **Ex. DDD** – A.M. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3348 – 3352 |
| 51-4 | 5/26/2023 | **Ex. EEE** – A.S. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3353 – 3363 |
| 51-5 | 5/26/2023 | **Ex. FFF** – B.B. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3364 – 3375 |
| 51-6 | 5/26/2023 | **Ex. GGG** – B.R. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3376 – 3397 |
| 51-7 | 5/26/2023 | **Ex. HHH** – D.P. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3398 – 3402 |
| 51-8 | 5/26/2023 | **Ex. III** – G.S. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3403 – 3412 |
| 51-9 | 5/26/2023 | **Ex. JJJ** – H.P. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3413 – 3418 |
| 51-10 | 5/26/2023 | **Ex. KKK** – J.S. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3419 – 3422 |
| 51-11 | 5/26/2023 | **Ex. LLL** – L.W. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3423 – 3435 |
| 51-12 | 5/26/2023 | **Ex. MMM** – S.S. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3436 – 3484 |

| 51-13 | 5/26/2023 | **Ex. NNN** – T.W. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3485 – 3490 |
|---|---|---|---|
| 51-14 | 5/26/2023 | **Ex. OOO** – Complaint about G.D. re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3491 – 3493 |
| 51-15 | 5/26/2023 | **Ex. PPP** – D.G. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3494 – 3501 |
| 51-16 | 5/26/2023 | **Ex. QQQ** – A.J. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3502 – 3513 |
| 51-17 | 5/26/2023 | **Ex. RRR** – A. W. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3514 – 3524 |
| 51-18 | 5/26/2023 | **Ex. SSS** – D.F. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3525 – 3536 |
| 51-19 | 5/26/2023 | **Ex. TTT** – D.P Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3537 – 3545 |
| 51-20 | 5/26/2023 | **Ex. UUU** – D.S. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3546 – 3559 |
| 51-21 | 5/26/2023 | **Ex. VVV** – H.C. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3560 – 3572 |
| 51-22 | 5/26/2023 | **Ex. WWW** – I.T. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3573 – 3577 |
| 51-23 | 5/26/2023 | **Ex. XXX** – J.G. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3578 – 3587 |

| 51-24 | 5/26/2023 | **Ex. YYY** – M.S. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3588 – 3593 |
|---|---|---|---|
| 51-25 | 5/26/2023 | **Ex. ZZZ** – J.M. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3594 – 3607 |
| 52 | 5/26/2023 | **Ex. AAAA** – N.C. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3608 – 3620 |
| 52-1 | 5/26/2023 | **Ex. BBBB** – P.H. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3621 – 3632 |
| 52-2 | 5/26/2023 | **Ex. CCCC** – S.D. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3633 – 3650 |
| 52-3 | 5/26/2023 | **Ex. DDDD** – T.D. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3651 – 3658 |
| 52-4 | 5/26/2023 | **Ex. EEEE** – Habitudes Salutes and Snubbs re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3659 – 3663 |
| 52-5 | 5/26/2023 | **Ex. FFFF** – Board of Education Policy on Discrimination re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3664 – 3703 |
| 52-7 | 5/26/2023 | **Ex. HHHH** – Secondary School Handbook 2021-2022 re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3716 – 3777 |
| 52-8 | 5/26/2023 | **Ex. IIII** – Skyward Discipline Report re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3778 – 3781 |
| 52-9 | 5/26/2023 | **Ex. JJJJ** – State of Michigan Report on Race Discrimination re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3782 – 3783 |

| **52-10** | 5/26/2023 | **Ex. KKKK** – Teacher Training Attendance Records re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3784 – 3857 |
|---|---|---|---|
| **52-12** | 5/26/2023 | **Ex. MMMM** – B.A. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3929 – 3943 |
| **52-13** | 5/26/2023 | **Ex. NNNN** – B.J. 11/15/2021 Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3944 – 3949 |
| **52-14** | 5/26/2023 | **Ex. OOOO** – B.J. 11/18/2024 Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3950 – 3959 |
| **52-15** | 5/26/2023 | **Ex. PPPP** – B.N. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3960 – 3969 |
| **52-16** | 5/26/2023 | **Ex. QQQQ** – C.P. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3970 – 3979 |
| **52-17** | 5/26/2023 | **Ex. RRRR** – C.S. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3980 – 3997 |
| **52-18** | 5/26/2023 | **Ex. SSSS** – E.L. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 3998 – 4012 |
| **52-19** | 5/26/2023 | **Ex. TTTT** – G.P. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4013 – 4018 |
| **52-20** | 5/26/2023 | **Ex. UUUU** – J.S. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4019 – 4031 |
| **52-21** | 5/26/2023 | **Ex. VVVV** – J.W. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4032 – 4042 |

| 52-22 | 5/26/2023 | **Ex. WWWW** – K.M. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4043 – 4050 |
|---|---|---|---|
| 52-23 | 5/26/2023 | **Ex. XXXX** – T.B. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4051 – 4058 |
| 52-24 | 5/26/2023 | **Ex. YYYY** – W.W. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4059 – 4068 |
| 52-25 | 5/26/2023 | **Ex. ZZZZ** – J.M. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4069 – 4073 |
| 53 | 5/26/2023 | **Ex. AAAAA** – W.H. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4074 – 4088 |
| 53-1 | 5/26/2023 | **Ex. BBBBB** – C.V. Suspension Documents re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4089 – 4094 |
| 53-2 | 5/26/2023 | **Ex. CCCCC** – Message from Jeff to April Malick re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4095 – 4096 |
| 53-3 | 5/26/2023 | **Ex. DDDDD** – 10/6/2020 Rob Malick Email to Bridgid vanHowe re: Plaintiffs' Response to Defendants' Motion for Summary Judgment | 4097 – 4099 |
| 67 | 2/20/2024 | Opinion and Order Granting Defendants' Motion for Summary Judgment | 4208 – 4240 |
| 68 | 2/20/2024 | Judgment | 4241 |
| 69 | 2/22/2024 | Plaintiffs' Notice of Appeal | 4242 – 4243 |